United States District Court
District of Connecticut
FILED AT HARTFORD
1/4 2017
Roberta D. Tabora, Clerk
By [signature]
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

DAVID QUATRELLA

CRIMINAL NO. 3:17CR 3 (AWT)

VIOLATION:

18 U.S.C. § 371 (Conspiracy)

INFORMATION

The United States Attorney charges:

COUNT ONE
(Conspiracy)

The Defendant

1. At all relevant times, the defendant, DAVID QUATRELLA, was a resident of Connecticut and an attorney licensed to practice law in Connecticut.

Background Regarding Life Insurance Policies

2. A life insurance policy is a contract between a life insurance company and a policy owner and/or insured person. A policy normally requires the insurance company to pay a sum of money to the insured's beneficiary, who often is a relative of the insured, upon the insured's death. This sum of money is commonly referred to as the "death benefit." To put in force and maintain the validity of a policy, the insured usually makes periodic payments, known as "premiums," to the insurance company throughout the policy period.

3. Universal life policies are one of several types of life insurance policies offered by life insurance companies. As with other types of life insurance policies, a universal life policy provides a death benefit to the insured's beneficiaries and

requires premium payments to the insurance companies. A defining feature of universal life policies was that the insured typically had the option of paying additional premium amounts above the amount required to keep the policy valid. Any amount paid in excess of the required premium becomes a policy's cash value. A policy's cash value earns interest and can be used to satisfy future premium payments. The interest accrues on a tax-deferred basis. Insurance companies benefited from the investment profits and realized increased cash flow generated by excess premium payments.

4. In recent years, a derivative market for life insurance has developed in which existing life insurance policies are sold to third parties who lack an insurable interest in the life of the insured. Typically referred to as a "life settlement" or "senior settlement," these sales normally are lawful, assuming that the policy was procured for legitimate purposes and that there was an "insurable interest" at the policy's inception. An example of a circumstance in which a policy holder may choose to sell a policy is an unforeseen life event that necessitates the current use of funds paid into a policy or the inability to continue to pay premiums to keep the policy in force.

5. An "insurable interest" is defined as an interest in the continued life of the insured individual. A person is considered to have an insurable interest when, at the time of policy issuance, that person is in a position where he or she hopes for the continued life of the insured and will be damaged by the insured's death, and thus uses the policy proceeds (*i.e.*, the death benefit) to mitigate that damage.

6. As this derivative market has developed, some have sought life

insurance policies not for legitimate insurance needs, but rather with the intent that investors (or others lacking an insurable interest) will obtain ownership of the policies. Among other terms, policies procured under these circumstances have become known as stranger-originated life insurance ("STOLI") policies. At all times relevant to this Information, it was the practice of life insurance providers to deny an application for a universal life insurance policy if the policy holder intended, from the outset, to resell the policy, or if the policy holder financed the policy through an investor whose ultimate intent was to take over ownership of the policy.

7. In a typical prohibited STOLI transaction, the STOLI investor (or the investor's representative) induces a prospective insured, often a senior citizen, to purchase a life insurance policy that he or she likely would not otherwise have purchased. The prospective insured applies for the policy with a prior understanding to cede control of the policy to the investor. The prospective insured and the investor agree that, at the end of a given period, ownership of the policy will be transferred to the investor, or some other third party, who would expect to receive the death benefit when the insured dies.

8. The investor (or the investor's representative) may arrange financing of the premiums during the time the initial policy holder owns the policy by means of non-recourse premium financing; that is, the only collateral for the loan is the insurance policy itself. When the policy is transferred, the loan may be forgiven in return for control over the policy. Indeed, STOLI arrangements may be marketed as "free insurance," because during the period prior to transfer of the policy, the insured

has life insurance protection, paid for with a loan that will not have to be repaid if the policy is ultimately transferred. As a result, life insurance providers use the existence of non-recourse premium financing as one indicator of a STOLI policy.

9. Life insurance providers typically take several steps to prevent the issuance of STOLI policies because, among other things, such policies cause a discrepancy between the benefits reasonably anticipated by the providers and the actual benefits received. To ensure that STOLI policies are not issued, the providers, among other things, request and rely on representations from insurance agents and applicants regarding (a) the insured and/or policy owner's intent to resell the policy, or discussions regarding the possibility of resale; (b) the existence of third-party payment of premiums; and (c) the purpose of procuring the policy.

10. The facts underlying these representations made by and on behalf of the applicants were essential elements of the agreements between life insurance providers and insureds and/or policy owners. An insured and/or owner's intent to resell a policy, the existence of third-party financing of premiums, and the purpose of the policy, significantly informed life insurance companies' financial expectations with respect to universal life policies. Accordingly, where life insurance providers were deceived into issuing a universal life policy based on misrepresentations and/or fraudulent statements regarding the above-referenced factors, the providers were harmed in several ways, including by undermining providers' assumptions regarding how frequently policies would lapse, and by altering providers' expectations about how much premium policy holders would put into their universal life policies.

The Scheme and Artifice to Defraud the Life Insurance Providers

11. From in or about June 2008 up to and including in or about January 2016, QUATRELLA and others known and unknown to the United States Attorney engaged in a scheme and artifice to defraud life insurance providers and to obtain money and property from the providers by means of materially false and fraudulent representations regarding the purpose of certain insurance policies, the presence of premium financing, and the intent of the applicant to sell the policy, in order to induce the providers to issue life insurance policies in reliance upon such false and misleading information.

Use of Interstate Wires

12. It was a part of the scheme and artifice to defraud that QUATRELLA and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted, in interstate commerce by means of wire communications, certain writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

The Conspiracy

13. From in or about June 2008 up to and including in or about January 2016, in the District of Connecticut and elsewhere, QUATRELLA and others known

and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud as described above, in violation of Title 18, United States Code, Section 1343.

Manner and Means of the Conspiracy

14. The manner and means by which QUATRELLA and his co-conspirators sought to accomplish the purposes of the conspiracy included, among other things, the following:

15. QUATRELLA, and/or other co-conspirators, would and did recruit elderly persons to apply for life insurance policies.

16. QUATRELLA, and/or other co-conspirators, would and did offer to the insureds the promise of free life insurance for two years, after which QUATRELLA and/or other co-conspirators would attempt to sell the policy, and provide a share of the proceeds to the insured. The insured was not obligated to pay anything; he/she was commonly told that the premiums were being borrowed from a third party source.

17. QUATRELLA, and/or other co-conspirators, would and did recruit investors to finance the payment of premiums on the life insurance policies, with the understanding that the investors would earn a profit upon the sale of the policy.

18. QUATRELLA, and/or other co-conspirators, would and did cause to be submitted to various life insurance providers applications containing materially false and misleading information regarding, among other things, the existence of third-party payment of premiums and the intent to sell the policy, with the intent to induce fraudulently the providers to issue insurance policies on the lives of the insureds.

19. QUATRELLA, and/or other co-conspirators, would and did fail to disclose to the providers any information or documentation regarding premium funding arrangements for the policies, with the purpose of hiding the existence of such arrangements from the providers.

20. QUATRELLA, and/or other co-conspirators, would and did regularly receive large commissions from the providers as a result of the issuance of insurance policies on the lives of the insureds.

21. QUATRELLA, and/or other co-conspirators, would and did take steps to attempt to sell the life insurance policies to life settlement investment funds or brokers.

The D.S. Policy

22. By way of example, on or about October 2, 2008, QUATRELLA and his co-conspirators caused D.S., an elderly client of QUATRELLA's law firm, to apply for and obtain a $15 million life insurance policy from Lincoln National Life Insurance Company ("Lincoln"). For his role in causing the issuance of D.S.'s policy, QUATRELLA earned approximately $174,000 in commissions from Lincoln.

23. QUATRELLA helped D.S. to complete the application and, in so doing, falsely certified to Lincoln that, among other things, the policy premiums were not being financed by any third party and there was no intention on the part of the insured to sell the policy.

24. QUATRELLA also used his position as D.S.'s attorney to write a letter on his law firm's stationery to Lincoln's agent, in which QUATRELLA falsely

represented that the life insurance policy was needed for D.S.'s estate planning purposes.

25. In truth, QUATRELLA knew that the policy premiums were being financed by a pool of investors, many of whom QUATRELLA recruited from among his law firm's other clients. Further, it was the intention of QUATRELLA and his co-conspirators to facilitate the sale of D.S.'s policy after two years to other downstream investors at a profit to the initial pool of investors.

26. In furtherance of the conspiracy, QUATRELLA transmitted premium payments from the initial pool of investors to Lincoln via checks and interstate wire transfers from QUATRELLA's attorney trust account at Bank of America, N.A.

27. Ultimately, however, QUATRELLA and his co-conspirators could not find a buyer for D.S.'s policy, and the policy was permitted to lapse in or about January 2016.

The J.S. Policy

28. QUATRELLA and his co-conspirators also arranged for another elderly insured, J.S., to apply for and obtain a $10 million life insurance policy from Lincoln, with an effective date of on or about December 28, 2009. For his role in causing the issuance of J.S.'s policy, QUATRELLA earned approximately $98,000 in commissions.

29. J.S. was not a client of QUATRELLA's law firm, and QUATRELLA did not help to complete J.S.'s application. However, QUATRELLA connected J.S. with his co-conspirators for the purpose of having J.S. apply for a life insurance policy, and

QUATRELLA knew and intended that J.S.'s application contained material misrepresentations as to the policy's purpose, the means by which the premiums would be paid, and the intent to sell the policy to downstream investors after two years.

30. QUATRELLA also recruited from among his law firm's clients the initial pool of investors to pay the policy premiums, and QUATRELLA transmitted premium payments to Lincoln via checks and interstate wire transfers from his attorney trust account.

31. Ultimately, QUATRELLA and his co-conspirators could not find a buyer for J.S.'s policy, and on or about February 24, 2014, the policy lapsed for nonpayment of premiums.

32. On or about March 6, 2014, QUATRELLA directed a paralegal to place an interstate telephone call to Lincoln for the purpose of having the policy reinstated. QUATRELLA instructed the paralegal via email not to "mention anything about the loan of the premium from my clients." Nevertheless, QUATRELLA and his co-conspirators were not successful in having the policy reinstated.

Overt Acts

33. In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the District of Connecticut, and elsewhere, at least one of the following overt acts, among others:

34. On or about July 27, 2015, QUATRELLA transmitted a premium payment of $65,000 from the initial pool of investors on the D.S. policy to Lincoln via

an interstate wire transfer from QUATRELLA's attorney trust account.

35. On or about September 28, 2015, QUATRELLA transmitted a premium payment of $64,000 from the initial pool of investors on the D.S. policy to Lincoln via an interstate wire transfer from QUATRELLA's attorney trust account.

36. On or about November 25, 2015, QUATRELLA transmitted a premium payment of $75,000 from the initial pool of investors on the D.S. policy to Lincoln via an interstate wire transfer from QUATRELLA's attorney trust account.

37. On or about December 1, 2015, QUATRELLA transmitted a premium payment of $1,100 from the initial pool of investors on the D.S. policy to Lincoln via an interstate wire transfer from QUATRELLA's attorney trust account.

All in violation of Title 18, United States Code, Section 371.

FORFEITURE ALLEGATION

38. Upon conviction of the conspiracy offense alleged in Count One of this Information, the defendant, DAVID QUATRELLA, shall forfeit to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 371, including but not limited to a sum of money equal to $272,000.

39. If any of the above-described forfeitable property, as a result of any act or omission of the defendant, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the

intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

All in accordance with 18 U.S.C. § 981(a)(1) as incorporated by 28 U.S.C. § 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.

UNITED STATES OF AMERICA

DEIRDRE M. DALY
UNITED STATES ATTORNEY

AVI M. PERRY
ASSISTANT UNITED STATES ATTORNEY