UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,   :

                Plaintiff,   :

VS.   :   NO: 3:17-cr-00003 (AWT)

DAVID QUATRELLA,   :

                Defendant.   :   April 17, 2017

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The defendant respectfully submits this memorandum in aid of sentencing and in support of his request for a non-confinement, below-guideline sentence, whether by departure or variance and whether for a single factor or a combination of factors including offender characteristics of a kind, or to a degree, not adequately taken into consideration in determining that Guideline range; 5K2.0 (Policy Statement); 18 U.S.C. §3553(b).

## I. History and Characteristics of the Defendant and Impact on Sentencing Guidelines Range

David Quatrella is 61 years of age, married to his wife Laurie for 23 years and the father of two children, both of whom attend Villanova University in Villanova, PA. Mr. Quatrella graduated from Fairfield University in May, 1977 with a Bachelor of Arts degree Cum Laude. He attended Villanova University Law School from 1977 to 1980 and received his Juris Doctor degree in May 1980. He was admitted to the Connecticut bar in 1980, the Pennsylvania bar in 1981 and the New Jersey bar in 1982. He has entered into a voluntary interim suspension of his law license in the Superior Court for the Judicial District of Ansonia/Milford on February 17, 2017; and the states of New Jersey and Pennsylvania have also reciprocally ordered an interim suspension. The full extent of discipline will be imposed after sentencing in this case. Mr. Quatrella has not practiced law since his plea of guilty and in fact had resigned from his law firm on December 30, 2016 prior to his guilty plea.

In accordance with 18 U.S.C. §3553(a) we ask the Court to impose a non-confinement sentence which under all of the circumstances will be sufficient but

not greater than necessary, to comply with the purposes set forth in par. (a)(2) of the statute. The following are the history and characteristics of David Quatrella.

## A. Employment and Non-Employment Related Contributions and Good Works, §5H 1.11

The Second Circuit has held that the district court may exercise its discretion and downwardly depart when public service and similar good works and extraordinary physical impairment are present when considering the history and characteristics of a defendant; *United States vs. Rioux,* 97 F.3rd 648, 663 (2nd Cir. 1996).

For the following reasons, we ask the Court to exercise its discretion on the basis of the characteristics of this defendant as set forth below and to downwardly depart and/or to vary from the Sentencing Guidelines in this case in order to impose a below the guidelines non-confinement sentence.

Maria M., a former employee, has written to the Court in her February 22, 2017 letter. (Ex. B) She had worked as his assistant since September 1998 and captures the nature of David Quatrella:

> Although I did not have as much experience in the field he practiced, he had a lot of patience and was appreciative of my efforts to learn and get better at my job...Prior to my pregnancy, my parents had been

3

seriously ill.  My father had Alzheimer and my mother had cancer.  I do not think I will ever find a more compassionate boss who held my position for me when I had a difficult pregnancy and had to be bedridden two months prior to giving birth.  He gave me the opportunity to stay out on maternity leave longer when he found out my mother was dying so that I could be there for her and my dad.  Dave never gave me deadlines or ultimatums, just compassion and comfort and the time I needed.  He had food brought to my family's home when each of my parents passed.  He sat with me when I cried for my parents and later when I was having hardship with my now ex-husband...all he ever said was take the time I need and wished me and my family well.  That is Dave, compassionate, thoughtful and caring.

Joe Drum who is presently senior vice president for Fidelity National Title Group in Santa Barbara, California writes (Ex. B) that he is a friend and fellow lawyer who has known David Quatrella since 1979.  Joe Drum watched David's swearing in as an attorney in 1980 and has remained close throughout the last 38 years.  Mr. Drum writes about his experience with David on the Board of Directors of the International Institute of Connecticut which helps refugees and other immigrants assimilate into American society.  He writes how David explained to Mr. Drum that his own grandparents were assisted by the International Institute when they immigrated to the United States during the

1920's and that joining the Board would be a way to repay the organization for

the help that had been provided to his family so many decades earlier.

> Dave was one of the most helpful Board members of the International Institute ever. He was very giving of his time, talents, and money to help the needy as these refugees came to America out of fear for their lives from their country of origin. Dave always had an empathy for these immigrants that honestly was greater than most other members. Dave provided money for food, housing and free legal counsel to the point where I had to tell Myra Oliver, the CEO of the Institute at the time, that we needed 'more Daves' lest he collapse before he's forty...Dave was always very giving of his time to assist and opened his heart to these people. And, at a time when our government funding stopped, Dave helped start what became an annual event, a gala dinner in Bridgeport to raise funds for the International Institute which literally saved the organization more than 25 years ago.

The true essence of the nature and character of David Quatrella is

illustrated when Joe Drum writes of his own personal tragedy and the comforting

by his friend that he received in his time of need.

> One final personal note, in July-August in 2003, I was in a coma here in Santa Barbara, dying from Legionnaires Disease, pronounced "dead" during my 42 day coma; Yet my wife refused to pull the plug. After those six weeks in a coma, I awoke to being bedridden, perhaps permanently disabled and clearly and severely depressed; perhaps suicidal. Of all my friends, only two people from back East came to spend time with me, to cheer me

up and urge me to "go on" for my family.  Yes, as you may have guessed; it was Dave and Laurie.  That is Dave Quatrella's true character, 38 years that I have known him; to be a caring man, whose lifetime was epitomized integrity, empathy and compassion for others.

The Connecticut Post doesn't report on Dave's 33 years of service to his community, his deep belief in God, nor the torment his family endures which would be compounded exponentially were he to be taken away from them. I pray you hear the heartfelt sincerity of my plea your Honor.

Frederick Serra relates (Ex. B) how carefully and thoughtfully David provided benefits for his employees.  Mr. Serra managed the health care program for David Quatrella's employees.

While my company provided these services for over 600 businesses in Connecticut, I was always impressed with the respect and the way he cared for everyone of his employees.  When I visited with him each year and gave him the bad news that the rates were going up and that he needed to have his employees pay more of their premium, Dave would send me back to my office to redesign an approach where he could continue to pay all their premiums without reducing benefits. In most years, this would mean that he would absorb the full increase. Out of all my clients, Dave was the most caring when it came to his employees.  I will never forget where one employee had a baby that was really sick and could not get the right medical care in Connecticut. His plan would not allow using doctors out of the Connecticut network. Together, Dave and I got this child lifesaving medical

care with doctors in another state that specialized in this risky procedure. I have not shared this with Dave but I ran into the mother last month. I had a speaking engagement and she was in the audience and approached me. With a tear, she thanked me for everything we had done and told me her daughter was now married and gave birth to her own baby. She had been living a normal life after her procedure. The same was true for the husband of an employee that needed specialized heart surgery. Dave was there for them and we worked together to get the right care after the insurance company denied the procedure. I was amazed how he went above and beyond and treated others the way he would treat his own family.

Your Honor, I stated earlier in my letter that I can't speak on why Dave made a poor choice that got him where he is today; but I can speak from the heart to say that while he made a mistake, this is not the person that I have known for all these years.

Damir Lakic (Ex. B) writes that he along with his sister and mother immigrated to the United States in March 1967 with nothing more than they were able to carry. He was a 15 year old frightened, introverted kid who already suffered from anxiety and spoke no English. Only Dave approached him and treated him with patience and kindness. He helped Mr. Lakic learn English, helped him with homework and accepted him for who he was without hesitation. "Because of Dave, I can remember finally feeling like I had my place in the

7

United States. Such a simple sentence for a huge appreciation that remains in my core until this present day". He talks about how he has counted on Dave for legal advice on numerous occasions, most of which were pro bono. As they grew older and raised their own families, Mr. Lakic writes "the separation did not remove childhood memories, those of which I shared with my wife for years with a grateful and indebted heart".

Massimo Colandrea writes (Ex. B) in his March 1, 2017 letter:

> David's love for the law and helping others shows his true character. Countless times, David provided his knowledge Pro Bono because that is who he is. If he could help anyone, he would...

> We have always readily dialed David's number because we knew who would pick up. A man that for many years took on the role of his father and more, giving us both legal and business advice, with the same values his father instilled in him. That of a man of truth, honesty and integrity...I am very sad as I write to you because for me, it is like the end of an era. The same feeling I felt back when his father passed...his conviction of fraud is inconsistent with the character and honesty I have observed for so many years.

Lisa Fedick writes (Ex. B) how the agreements David drafted almost thirty years ago are still in effect and continue to serve their business well. Through tragedy when the manager of their investor's group was killed in an automobile

accident with his three children, David became a mentor to her, offering constant guidance and support over a 28 year period. David has been with her every step of the way. Her relationship with David has spanned almost three decades and one that has been built upon unwavering trust, integrity, friendship and mutual respect.

Gregory Eisen writes (Ex. B):

> Attorney Quatrella has been more than an attorney for my family. He has been a confidant, business advisor, and friend who has shown great support, generosity, and care over ten years of engagement... During this time, I've had the opportunity to observe Dave consistently provide ethical, thoughtful, caring, well founded legal and business council. He has always operated with a desire to help, not simply to bill hours... Dave has made himself available to us in times of need, on weekends, evenings, in between appointments while driving, often not even charging for his council... Your Honor, I ask you for all the mercy you can give to this good man who has led a worthy and generous life. A caring attorney, a family man, a friend.

Lisa and Louis Regina write (Ex. B), "we have seen each other through the sickness and deaths of our parents; we know each other's friends and siblings and attend each other's family gatherings. Our feeling is that he is a true and solid family man and we are proud and fortunate to call him our friend. That is why

this is such an emotional letter to write.  David is someone who has our love and respect always.  We have shared successes and failures, laughter and tough times; and it is so hard to put into words how important he is to so many people in so many ways.

Louis Regina writes that David Quatrella was always the one he could turn to and who he could trust.  "He's the guy who picks up the phone when I call".  Mr. Regina writes that he has been an entrepreneur for over 30 years, and David has represented him in over 100 commercial transactions.  "David's measured and precise approach  has been the perfect foil to my management style, especially in my younger years... David always goes the extra mile making sure myself and my family was properly protected.  In over 30 years we never had even a discussion over his legal fees', unheard of in today's world".

Jehu Rodriguez, Jr. writes (Ex.B) of David Quatrella's quality representation and his generosity toward his family by providing critical legal assistance without billing either him or his sister for whom Mr. Rodriguez had sought legal help from Mr. Quatrella.  In closing he writes:

> Dave is a good person, an honest person, he has integrity and heart.  I said this before and I will say it again, Dave is the only person I trust in this world.  Your Honor, this

> may not be the most well written letter but it is sincere.
> It is from the heart.  Whatever mistakes or misgivings
> Dave has made please consider the good he has done.  I
> plead with you for leniency.

John F. Fallon, (Ex. B) a professional colleague writes in his heartfelt

letter:

> In every such case the linchpin of his advice to me was
> always grounded upon those consistent characteristics of
> intelligence, courtesy and high ethical sensitivity.  I
> cannot speak to the specific facts or legal issues of the
> matter which have brought Dave before your Honor.  I
> will implore you, however, to take into consideration the
> lawyer, person, husband and father that Dave has
> consistently shown himself to be over these many
> decades. I can honestly say that I have no friend who is
> more kind, generous and sensitive to the needs of others
> than Dave...

Kevin J. Silverang, (Ex. B) a friend of nearly 40 years having known David

Quatrella since they were first year law students in Villanova in 1977 writes:

> When our daughter was born in critical condition, Dave
> supported us through three open heart surgeries.  He was
> there when our daughter married in 2013... Dave and I
> have  also  been  business  partners  in  real  estate
> transactions from time to time over the years. I have the
> highest regard for him as a person, as a family man, as a
> lawyer and as a business partner...[after learning of the
> defendant's guilty plea], I immediately called him and the
> devastation he felt was immediately evident.  Of all my

> friends and colleagues, no one has displayed more friendship, generosity, loyalty, integrity and good character to me and my family than Dave.

Anthony D'Alto, II writes (Ex. B) of his father and his own relationship with David Quatrella. After explaining that his stepmother and his father died within three months of each other, he gave up a career as a maritime lawyer in New Orleans to return to Connecticut:

> As you could imagine, the combination of these events was a shock to me. Not only had I lost two parents in the span of three months, but I was completely in the dark about my father's various businesses. At this most difficult time in my life, Dave stepped up and guided me through the abyss. Dave was the first person I called after my father passed away. Upon hearing the news, he dropped everything and he rushed over to the house to offer a shoulder to cry on. In the months and years to follow, Dave was there for me every step of the way as we encountered one obstacle after another in trying to wrap my father's affairs. It would have been impossible to get through this period in my life without Dave. His honesty, knowledge, diligence, compassion and support were all vital to my survival. I will forever be grateful to Dave for his hard work and support following my father's death.

Michael Berkowitz writes (Ex. B) of his experience with David Quatrella as his attorney. In closing he states:

"I would respectfully request that the Court take all of this into consideration when deciding on a sentence for Dave. He is a good man who has done many good things for others over the years, and is deserving of clemency in this instance. I know from my recent conversation with Dave that he is deeply remorseful for his actions. My sincere hope is that your Honor will see fit to take Dave's entire life's work into consideration when deciding upon his sentence.

Robert Perrotta, principal of Fairfield Prep writes (Ex. B)that David Quatrella is a former student, a parent of a son who attended Fairfield Prep, a colleague and a friend. He has watched him grow into a caring and loving husband and father, a man of competence and compassion.

I began seeing David on a more regular basis when his son, Daniel, entered Fairfield Prep. David and his wife Laurie were wonderful supportive parents attending many school events and becoming a real part of our Fairfield Prep community. David's son, Daniel truly reminded me of David when he was a student. It was clear that Daniel was raised by parents who instilled in him a moral compass and a work ethic. It was my privilege to write college recommendations on Daniel's behalf knowing him to be an excellent student and a young man of conscience and compassion reflecting the values of his wonderful parents.

Matt Grasso (Ex. B) who has known Dave since the mid-seventies write:

13

> Throughout the years, during our dating, vacations together, weddings, the birth of our children, the deaths of parents and friends, the trajectory of our careers - Dave has always been at the center of the group. The straight arrow, the constant, unwavering friend and confident - always available to lend an ear and share his counsel.

Mr. Grasso relates that Dave spent hours patiently listening to his elderly aunt in a calm and professional manner along with his natural warmth and concern which assured 'this very senior citizen that everything would be all rights." He writes that Dave was instrumental in his son Patrick's decision to attend high school at Fairfield Prep. His son excelled at Prep and considered his time at the school life changing. He also talks about his inability to fathom what has transpired in David's life; how Dave came to be involved, but it appears to be totally out of character to the man I know. The man he knows is "hardworking and dedicated, a devoted and engaged family man, always making his wife and children's welfare and happiness a priority. Dave was a loving and fiercely devoted son when his mom and dad were alive and we still talk about how much our parents meant to us...Dave is a stand-up guy, a true friend and is respected by all. His outstanding personal and professional qualities have been a constant

since I first met him.  I can only imagine the remorse, turmoil, soul -searching and heartache that he is experiencing".

Elizabeth Stack writes (Ex. B):

> I have known David Quatrella for almost 30 years.  We first met when I began dating my husband Bob.  They owned a home together....  Dave was our best man when we married...  We have shared the great joys of life. Marriages, births, milestones of our children and the simple joys of daily life.  We have supported each other during the sorrows and challenges of life as well.  The passing of parents and friends, illnesses and the daily struggles all face.  Through it all, David has been a supportive friend, offering calm, insightful guidance and much needed humor.

Understanding what the nature of the charges are, Ms. Stack writes "I now pause to stop and consider our friendship, and I've come to the conclusion that the recent events have not changed my opinion of Dave.  Friendship, to me, is based on respect, support, trust and a common foundation of beliefs, all of which characteristics I believe Dave possesses".

James Fenski writes (Ex. B) that he met Dave more than 35 years ago where they lived in a working class neighborhood in the East End of Bridgeport. He has always known Dave to be a person of generosity who helped his friends in many ways personally and professionally.  "You could always count on his

knowledge and support but most importantly, he gave freely of his time.  Dave always made himself available to me and many others within our circle of friends.  He has a reputation of being an outstanding attorney and an even better human being".  Mr. Fenski relates how a mutual friend had taken his own life and when he arrived, one of the first people he saw at the scene was Dave giving comfort to his own brother who discovered his friend's suicide.  Mr. Fenski has "always known him to be an honest and humble man".

James O'Neil writes (Ex. B) "Your Honor, Dave is a great person, friend, husband and father.  Knowing Dave the way I do, he is really suffering inside and will be paying the penalty for the rest of his life.  I ask that you think of all Dave's good qualities when making your decision".

Jeffrey Bruner writes about his friendship with David Quatrella.

> Nearly 8 years ago, my wife, Joanna, died.  She died of brain cancer, not a pleasant way to die.  Dave and Laurie were there for me and for my family as we played out this horrible nightmare and eventually buried my wife.  They catered a dinner for the family the night before the funeral.  Dave was there with me every step of the way and provided the support and friendship that I so desperately needed.

Patricia Kustom writes,

> "Dave is a generous, caring, honest human being and I
> am proud to call him my friend. Dave, along with his
> wife Laurie, have an unwavering dedication to the
> community. They could always be counted on to help
> those in need whether it was a friend or local family who
> experienced a tragedy or fundraising for local
> organizations including the Nichols Improvement
> Association where Dave's wife Laurie served as
> President and remains an active member...Dave is
> extremely proud of his two children who attend his alma
> mater, Villanova. Their daughter Allie is an exceptional
> student who plans to go to medical school. Her caring
> and gentle nature epitomizes her father. Their son Daniel
> who will be graduating from business school in May is
> an exemplary young man with a keen business sense that
> I am sure originated from his dad. Knowing how much
> Allie and Dan care for their dad, I image their concern
> over these unfortunate circumstances and impending
> sentencing is weighing heavy on them - it breaks my
> heart to see the toll these circumstances have taken on
> my friend and his family".

John Sparks writes (Ex. B) that he has a 40 year friendship with David

Quatrella. In thinking about what he wanted to express one phrase came to his

mind over and over which he believes is a true reflection of Dave "let me know

what I can do to help". He heard Dave say that so many times over the years to

him and to others; Dave was always there to step in and help regardless of the

size and scope of the problem. They climbed Mount Washington together and

have stayed connected to each other lives and to their children even though Mr. Sparks has remained in Pennsylvania.  "He is a man who cares about people and who backs his concern with both words and actions.  I'd suggest that that's a true evidence of friendship, increasingly rare in our world".

### B.  Letters from Family (Ex. C) – Family Considerations 5H1.6

Letters of  David's wife Laurie, their daughter Alexandra and son Daniel as well as his brother Donald and extended family William Pollock, Daniel Coscia, Kelly Quatrella, Susan Quatrella, Joseph Quatrella, Gregory Marshal and Glen Marshal are submitted for the Court's consideration.

These letters embody the love and concern not only that family has for David but also for those qualities and comfort that David has given and provided to members of his family, his employees, his professional colleagues, his clients and his friends throughout the course of his life.  With respect to family circumstances, we ask the Court to take into consideration the economic impact the family is and will endure without the defendant's ability to support them; see *Gall vs. United States*, 552 U.S. 38, 59, 128 S.Ct. 586, 602, 169 L.Ed.2d 445 (2007) (indicating that "compelling family circumstances" will justify a downward variance from the Guidelines).  A sentencing court relying on such

factors recognizes that there are costs to others that can outweigh any societal benefit to be gained by incarcerating a defendant.   The Second Circuit has consistently deferred to the judge of the district court as to whether circumstances of a particular case justify such a below-Guideline sentence, *United States vs. Galante*, 111 F3d. 1029 (2nd Cir. 1997)(upholding district court departure for the benefit of the family)

Exhibit D sets forth letters of equal importance for the Court's consideration.   These 27 letters were sent by people who care deeply for and support David Quatrella, and each letter demonstrates the same qualities that David Quatrella has demonstrated throughout the 61 years of his lifetime.   While the individuals who write to the Court do not know every detail of this offense, many do and have nevertheless sought to demonstrate their care, concern and support for David Quatrella.

### C. 5H1.4 **Medical Condition**

The defendant suffers from prostate cancer which is currently in remission. The medical records set forth the diagnosis which occurred on February 26, 2014. After a series of diagnostic procedures, David Quatrella commenced radiation therapy on September 23, 2014.   He underwent prostate brachytherapy at Yale

New Haven Hospital on October 22, 2014.  On October 22, 2016 the undersigned reported to the Court the current status of multiple cystic lesions scattered throughout the defendant's pancreas with one of the lesions having increased in size over the 2014 CT scan.  The December 2016 report of Ronald Salem, MD previously submitted to the U.S. Probation officer sets forth the radiation oncologist's report regarding the defendant's pancreatic cysts and states that the defendant has a 30% chance that the lesions on his pancreas could progress to malignancy, that surveillance is important and a repeat MRI is scheduled for 6 months from December; the firm date being June 5, 2017.

## II.  The Nature of the Offense

First, the defendant has allocuted at the time of his plea and has unconditionally accepted responsibility for the commission of this offense.  Also, the defendant's letter to the Court is set forth as Exhibit A.  Nothing set forth in this memorandum is intended in any way to diminish the defendant's complete acceptance of responsibility.

The leading case in the Second Circuit relating to sentencing in the context of STOLI insurance policies is *United States vs. Binday*, 804 F.3rd 558 (2nd Cir. 2015).  In *Binday*, the defendants submitted at least 92 fraudulent applications,

resulting in the issuance of 74 policies with a total face value of over $100 million dollars.   The policies generated by the *Binday* defendants total roughly $11.7 million dollars in commissions which range from 50 to 100 percent of the first year's premium payments and typically surpassed $100,000 on any given policy; *Id,* 804 F.3rd at 567.   The Court of Appeals observed that the district court explained it would "calculate the guidelines, consider the guidelines, and then sentence the old-fashioned way," *Id* at 598 noting the district court's comments that it found the case to be "a perfect example of why the [G]uidelines should be abolished," *Id* at 598.   The district court explained that it would "emphasize who the defendants are, what they did...and send a message...".   The district court found that "whatever the loss amount...this was a scheme perpetrated over a span of years, brazen...and characterized by a number of truly horrible behaviors on the defendants' part including 'rampant mendacity, the creation of false documents, [and] obstruction of efforts by the victims [and the government] to ascertain the truth'".  *Id* at 598-99.

The district court explained that it was "easy to calculate [losses] known...[to date] but difficult to estimate future losses.  *Id* at n.38.  Even if the district court "unders[tood] that the guidelines embody a preference for intended

loss [it] favor[ed] calculating actual loss which betters any reasonable estimate by virtue of being tethered in fact." n. 38.   In order to reach actual losses, the government added the commissions and death benefits that had been paid under the policies and subtracted any premiums the insurer received either before death or before termination by lapse or otherwise on a policy the outcome of which is known. *Id.* at 596.

Accordingly, as applied to this case, the government and defendant represented to the court at the time of the guilty plea that there is no calculable or actual loss.   The government reserved the right to argue intended loss, but both the district court and court of appeals findings in the *Binday* case counsel against trying to calculate an intended loss because it is simply not "tethered in fact". *Id*, n. 38.   It is respectfully submitted that using intended loss as a basis for sentencing in this case is irrational and substantively and procedurally unreasonable for the following reasons.

As set forth in the presentence report at par. 6, DS a 30 year client and friend of Mr. Quatrella came to this defendant and advised him that he had been told by another individual, unrelated to Quatrella, that he, DS, could make $1 million dollars if he applied for a $15 million dollar life insurance policy.  DS had

22

apparently either been advised by someone that he could do it or had heard about it and was interested in pursuing what DS understood would require no financial outlay by him. Although DS was over 70, he was and remains an extremely successful, sophisticated and wealthy real estate developer and owner. This defendant was not out trolling for clients, and DS was anything but the type of straw insureds that have existed in other STOLI prosecutions. All of the financial information regarding DS that was submitted to the insurance company was accurate and confirmed by DS's CPA. All of the medical information that was submitted in behalf of DS was accurate. In fact, one of the reasons why DS's policy was not sold was that his health actually improved which meant that his life expectancy was longer and therefore the marketability of his policy diminished.

David Quatrella has admitted that the application he signed was false in that it concealed the fact that the DS policy was intended to be resold after two years, that there was premium financing as well as representations made by the defendant that the policy was for estate planning purposes which was not true.

With respect to the JS policy, one of the relatives of the participants in the financing of the DS policy was contacted by a financial advisor for JS and her

husband who, unsolicited by the defendant, then referred the advisor to the defendant.   The defendant eventually arranged for the financing of the policy premiums but took no part in filling out the application.

The insurance company suffered no actual loss on either policy.   Premiums paid on the JS policy totaled nearly $880,000 and on the DS policy approximately $2.5 million.   The defendant received a total of $272,000 which he has agreed to forfeit.   The insurance company has never paid a death benefit or made any other payment other than the initial commission that was paid to the insurance agents of which defendant received $272,000 for both policies.   Therefore, there is no actual loss that was suffered by the insurance company.

### (a) The Intended Loss Guideline Range Substantially Overstates the Seriousness of the Offense, USSG §2B1.1 app. note 19(C).

As a starting point USSG §2B1.1 app. note 19(C) provides, "there may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.   In such cases, a downward departure may be warranted."   If intended loss was used as a basis for sentencing in this case, the guideline range would far exceed the statutory maximum of the offense for which the defendant has entered his plea of guilty; 18 U.S.C. §371.   It is

neither rational nor reasonable for the court to rely upon the intended loss guideline in this case, the application of which, without more, would result in the imposition of a maximum sentence of five years.  The AG policy is included in the presentence report at par. 11. The defendant did not procure or participate in the application for this policy.  It was referred for financing of the premiums. This policy, not charged, is also subject to the same argument objecting to intended rather than actual loss as set forth herein relating to the DS and JS policies.  The AG policy was sold and is apparently in force, although the defendant has no direct knowledge about its current status.

In *United States vs. Corsey*, 723 F.3rd 366 (2nd Cir. 2013), the Court of Appeals vacated and remanded sentences imposed on defendants of twenty years, the statutory maximum which was imposed pursuant to §5G1.1(a) where the guidelines based on intended loss indicated a sentence of life imprisonment. Although *Corsey* was remanded for procedural error, because the district court failed to articulate its consideration of §3553(a) factors and the issue of substantive error was not reached in the majority opinion, the concurring opinion of Judge Underhill starkly notes that "three sets of amendments to the loss table of the fraud guideline alone have effectively multiplied several times the

recommended sentence applicable at 1987 for large-loss frauds, which itself was set higher than historic sentences.   Each of the three increases in the recommended Guidelines ranges for fraud crimes was directed by Congress without the benefit of empirical study of actual fraud sentences by the Sentencing Commission".  Judge Underhill writes:

> The error of accepting intended loss as a proxy for the seriousness of this crime was compounded by the fact that the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what §3553 requires. *citing United States vs. Dorvee*, 616 F.3rd 174, 184 (2nd Cir. 2010).

In *Corsey,* a single factor - intended loss - drove the Guidelines calculation, and a single §3553(a) factor - deterrence - provided the basis for accepting the Guidelines recommended sentence.   It is settled that the district court does not presume that a sentence within the Guidelines range is reasonable.  See, *United States vs. Cavera*, 550 F.3rd 180, 189, 199 (2nd Cir. 2008) quoting *Gall vs. United States,* 552 U.S. at 47 (2007) (see *Nelson vs. United States,* 555 U.S. 350, 352 (2009)("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable"); *Rita vs. United States*, 51 U.S. 338,

351 (2007) ("sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").  While the Court is instructed to use the Guidelines as an initial benchmark, they are only "one factor among several" that the Court should consider, and can and should play no role in the sentencing decision when doing so would undermine federal sentencing objectives. *Kimbrough v. United States,* 552 U.S. 85, 90 (2007).

In *Corsey,* Judge Underhill found that although the district court used the intended loss amount correctly for purposes of calculating the sentencing guidelines range, the district court erred by failing to dramatically discount that calculation when weighing the §3553(a) factors against the totality of the circumstances in the case; 723 F.3rd at 379.  Like *Corsey,* there is no actual loss in the Quatrella case.  As another district court has observed,

> [T]he...commission chose to focus largely on a single factor as the basis for enhanced punishment; the amount of monetary loss or gain occasioned by the offense.  By making a Guidelines sentence turn, for all practical purposes, on this single factor, the...Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, see 18 U.S.C. 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.

*United States vs. Gupta*, 904 F.Supp.2d 349, 351 (*S.D.N.Y.* 2012).   Employing

loss as the principal proxy for culpability in determining fraud sentences is a

dubious proposition, if not contrary to the law, and indeed imposing a sentence on

Mr. Quatrella approaching the guidelines range calculated in the PSR would be

"irrational" on its face and substantively unreasonable.

As Judge Underhill noted, respected commentators have observed "for the

small class of defendants...convicted of fraud offenses associated with very large

guidelines loss calculation, the guidelines now are divorced both from the

objectives of Section 3553(a) and, frankly, from common sense.   Accordingly, the

guidelines calculations in such cases are of diminished value to sentencing

judges".   *Frank O Bowman, III Sentencing High - Loss Corporate Insider Frauds*

*After Booker,* 20 Fed. Sent'g. Rep. 167, 168, (2008).   As Judge Underhill

observed in his concurring opinion "...the low marginal utility of the guideline in

this very high intended loss case should have prompted greater, not lesser,

reliance on the section 3553(a) factors other than the Guidelines"; *Corsey*, 723

F.3rd at 380.

**(b) <u>Sophisticated Means Objection</u>**

The defendant objects to the use of the sophisticated means enhancement under §2B1.1(10)(C) in addition to the adjustment under §3B1.3 for breach of trust or use of special skill.  We ask the Court to invoke the rule of lenity in order to avoid a 4 level rather than 2 level increase in the Guideline calculation under the facts of this case.  Although it is theoretically possible for breach of trust to exist in the absence of sophisticated means, in this case it was the use of a special skill as an attorney §3B1.3 which is no different from "sophisticated means" within the meaning of §2B1.1(10)(C).  We therefore ask the Court not to exceed a 2 level increase in the Guidelines calculation.

**III. <u>Section 3553(a) Factors</u>**

David Quatrella is 61 years of age; has now lost his license to practice law, his ability to earn a living and to support his family consisting of a wife and two children; his son will be graduating from Villanova this May and his daughter is a sophomore and will not be completing her undergraduate studies for another two years.  Mrs. Quatrella has reentered the work force as a real estate agent, but her earning ability is uncertain at best.  It is not an overstatement to say that this man who has touched so many lives in such a constructive, caring and admirable way

has lost and stands to lose virtually every tangible economic asset and most importantly his ability to earn that he worked so hard for his entire life.

The consequences of his action have been and are crushing.  He can no longer support his family, see §5H1.6, has lost his ability to practice law and for how long we will not know until after sentencing and after the Superior Court in Connecticut determines the full extent of his discipline.  For some, the loss of a law license may not be devastating either because an individual was not fully immersed in the profession or because he may have the ability to earn from other sources.  But this case is personally and economically devastating to David Quatrella and his family because he has no other likely means of support.

The quality and degree of the emotional support expressed in these letters truly reflect the goodness, the caring nature and the devotion that David Quatrella has shown as a person and as a professional.  If we were all to be judged by our worst decisions, it would not be a fair appraisal of any single person's lifetime of achievement and devotion to family, friends and community that should be considered under §3553(a).  The individuals who have submitted these letters were under no obligation to do so.  The letters capture not only emotions that the writers have expressed but also the quality of the man who has plead guilty, taken

responsibility for the commission of this offense and now stands before this Court publicly shamed and humiliated after a lifetime of good deeds.

The undisputed fact remains that the insurance companies have lost nothing. It is also undisputed that DS initiated the process, because he believed he could make $1 million dollars without spending a cent - information he received from individuals or sources completely unrelated to this defendant. With respect to JS the defendant did not prepare the application for insurance. The importance here is that while his involvement in both these policies violated the law and we fully acknowledge that, these are much different circumstances from the circumstances in *Binday* where the defendants were out recruiting straws whose 74 applications were replete with lies and misrepresentations that resulted in roughly 11.7 million dollars in commission.

Given the very real and devastating consequences to the defendant and his family including this public humiliation and the loss of his ability to earn sufficient or any income to support his family at this point in time, and the defendants precarious and uncertain medical condition, we ask the Court to consider as lenient a sentence as possible under the circumstances. David Quatrella is fundamentally a good person, a decent person, a person who has

made a real difference in many lives, a devoted husband, a devoted father, a devoted friend and constructive member of his community.   He is certainly specifically deterred from ever engaging in this conduct again, because objectively he can no longer practice law and the consequences caused by his conduct have been so devastating to him that he would never offend again.

In terms of general deterrence, his humiliation has been public, and the entire community in which he lives knows that he has plead guilty, will be sentenced by this Court and has been suspended from the practice of law.  If this is not enough in terms of punishment then the question may fairly be asked what additional punishment is sufficient, but not greater than necessary to serve the purposes of sentencing.

Further, David Quatrella faces an uncertain medical future, already having battled prostate cancer and now the 30 percent probability that he will develop pancreatic cancer.   In the end our plea for leniency is not based solely on compassion; it is certainly based upon what we respectfully submit would be a just result which is after all the purpose of sentencing.

For all these reasons we respectfully request that the Court impose a below the Guidelines, non-confinement sentence, (1) because of all of the §3553(a)

characteristics of this defendant, (2) the absence of any loss by the insurance company, (3) the offense level resulting from the government's and PSR loss calculations overstates the seriousness of this offense, see *Corsey*, 723 F.3rd 366, 377 and (4) no court in the second circuit has used the intended loss guideline and has declined to do so in the context of a STOLI insurance policy; see *Binday supra*.

## IV. <u>Restitution</u>

In its recent letter of March 8, 2017 the government has represented that it does not view the individuals who financed the premium payments to be victims in this case within the meaning of the Crime Victims' Rights Act, 18 U.S.C. §3771. The individuals who financed the premiums are highly successful, very astute individuals who had every opportunity to consult other counsel to determine whether they should fund the premium payments in either one of these insurance policies. At the time the DS

policy was issued, all of them were independently well acquainted with DS.  It is submitted that the lenders are not victims[1].

We ask the Court to accept the position of the government and the defendant that the lenders in this case are not victims within the meaning of the Restitution Acts.  See also, *United States vs. Fernandez*, 877 F.2d 1138 (2nd Cir. 1989) (recognizing a downward departure to give effect to the parties written plea agreement).  Although it is somewhat different, because *Fernandez* does not deal with restitution, a conclusion that the government and the defendant have come to is the result of a valid and accurate view of the circumstances of this case.

THE DEFENDANT,
David Quatrella


BY /s/ Andrew B. Bowman
ANDREW B. BOWMAN
Fed. Bar No: ct00122
1804 Post Road East
Westport, CT 06880
(203) 259-0599
(203) 255-2570 (Fax)
E-mail:andrew@ andrewbowmanlaw.com

---

[1] The lenders in DS have settled their claims against the defendant and released him from any further liability to them.  Litigation between the JS lenders and the defendant is not resolved.

34

## **CERTIFICATION**

This is to certify that on this 17th day of April, 2017, a copy of the foregoing Defendant's Memorandum in Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Andrew B. Bowman .
ANDREW B. BOWMAN