UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL NO. 3:17CR3(AWT) |
| v. : | |
| : | |
| DAVID QUATRELLA : | April 27, 2017 |

**Sentencing Memorandum**

For over seven years, the defendant, David Quatrella, abused his position as an attorney to facilitate an insurance fraud scheme. On January 3, 2017, he pleaded guilty to a one-count information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. He is now seeking a non-incarcerative sentence. But such a sentence is wholly inadequate to reflect the seriousness of the offense, the multiyear nature of Mr. Quatrella's involvement, his flagrant misuse of his position as an attorney to facilitate the crime, and his personal gain ($272,000) from the offense. At the same time, these aggravating factors are offset somewhat by the defendant's personal history and characteristics, and the absence of any actual loss to the victim insurers in this case. Accordingly, the Government respectfully suggests that a sentence of three years of imprisonment is appropriate here.

**I.      Factual Background**

The facts underlying Mr. Quatrella's conviction are set out accurately in the presentence report ("PSR"), and adopted by the Government with certain supplementary details and supporting exhibits as follows.

1

From June 2008 until January 2016, Mr. Quatrella participated in an insurance fraud scheme involving "stranger-oriented life insurance" ("STOLI") policies. As described by the Second Circuit, a "STOLI policy is one obtained by the insured for the purpose of resale to an investor with no insurable interest in the life of the insured—essentially, it is a bet on a stranger's life." *United States v. Binday*, 804 F.3d 558, 565 (2d Cir. 2015). "STOLI policies became a popular investment in the mid-2000s for hedge funds and others eager to bet that the value of a policy's death benefits would exceed the value of the required premium payments. In response, many insurance companies . . . adopted rules against issuing STOLI policies and took steps to detect them." *Id.*[1] But insurance brokers and others, like Mr. Quatrella, who received commissions for new policies that they helped put into place, "had a financial incentive to place STOLI policies by disguising them to the insurer as non-STOLI policies. By matching a potential insured with a STOLI investor, a broker could

---

[1] Insurers have a financial interest in avoiding STOLI policies, because STOLI policies distort the complex risk calculations on which insurers base decisions about whether, and on what terms, to issue policies. Among other things:

> Under a regular life insurance contract, a certain percentage of policyholders will surrender their policies or allow them to lapse. In these cases the insurer retains all premiums which have been collected and never pays out a death benefit. Insurance companies have come to rely on this percentage and use the information to calculate premiums for all the policies they issue. STOLI transactions distort this percentage because STOLI is designed to ensure that policies never lapse and that the death benefit is always paid, just not to the original insured.

Eryn Mathews, *STOLI on the Rocks: Why States Should Eliminate the Abusive Practice of Stranger-Owned Life Insurance*, 14 Conn. Ins. L.J. 521, 529-30 (2008); *see also Binday*, 804 F.3d at 574 ("[I]nsurers expected STOLI policies to differ economically, to the insurers' detriment, from non-STOLI policies.").

generate a commission on a policy that would not have been issued had the insurer known the policy's true purpose." *Id.* at 565-66.

Mr. Quatrella was involved in at least three STOLI policies. In each instance, he conspired with others (including insurance brokers in California, New Jersey, and Florida) to mislead the insurer into issuing a policy based on material misrepresentations about the policy's purpose, the means by which the premiums would be paid, and the insured's intent to sell the policy to investors.

In the first instance, Mr. Quatrella helped a 72-year-old longtime client of Mr. Quatrella's law firm, D.S., to apply for and obtain a $15 million life insurance policy from Lincoln National Life Insurance Company ("Lincoln"), with an effective date of October 2, 2008. Mr. Quatrella sat face-to-face with D.S. and helped D.S. to complete the application. In so doing, Mr. Quatrella falsely certified to Lincoln that, among other things, the policy premiums were not being financed by any third party and there was no intention on the part of the insured to sell the policy. *See* Ex. 1 at 1. The defendant also created a trust that technically owned the policy, installing himself as one of two trustees. Mr. Quatrella signed the D.S. application in that capacity. *See id.* at 8. He also falsely answered questions on the application directed at the policy's owner. *See id.* at 2. Mr. Quatrella also used his position as D.S.'s attorney to write a letter on his law firm's stationery to Lincoln's agent, in which Mr. Quatrella falsely represented that the life insurance policy was needed for D.S.'s estate planning purposes. *See* Ex. 2. In truth, the defendant knew that the policy premiums were being financed by a pool of investors, all of whom the defendant recruited from among

his law firm's clients. Further, it was Mr. Quatrella's intention to facilitate the sale of D.S.'s policy after the expiration of the policy's two-year contestability period to other downstream investors at a profit to the initial pool of investors, and indeed Mr. Quatrella prepared an illustration showing the possible investment returns. *See* Ex. 3. In furtherance of the scheme, the defendant transmitted premium payments from the initial pool of investors to Lincoln via checks and interstate wire transfers from his Interest on Lawyer Trust Account ("IOLTA"). Ultimately, however, Mr. Quatrella and his co-conspirators could not find a buyer for D.S.'s policy. Indeed, the market for reselling life insurance policies was drying up at the same time that the D.S. policy was issued in late 2008. *See* Ex. 4. Hence, by the time the two-year contestability period ended in 2010, no buyer could be located. As a result, the original investors (*i.e.*, Mr. Quatrella's clients) never recouped their losses (*i.e.*, the premium payments), even though Mr. Quatrella and his co-conspirators enjoyed substantial commissions from the policy's issuance. Ultimately, the policy lapsed in January 2016 for non-payment of premiums.

In the second instance, Mr. Quatrella and his co-conspirators arranged for a 78-year-old insured, J.S., to apply for and obtain a $10 million life insurance policy from Lincoln, with an effective date of December 28, 2009. J.S. was not a client of the defendant's law firm, and the defendant did not help to complete J.S.'s application (as he had done with D.S.). However, Mr. Quatrella connected J.S. with his co-conspirators for the purpose of having J.S. apply for a life insurance policy, and Mr. Quatrella knew and intended that J.S.'s application contained material

4

misrepresentations as to the policy's purpose, the means by which the premiums would be paid, and the intent to sell the policy to downstream investors after two years. *See* Ex. 5 at 5. Mr. Quatrella again recruited the initial pool of investors to pay the policy premiums from among his law firm's clients, and Mr. Quatrella transmitted premium payments to Lincoln from his IOLTA. Mr. Quatrella and his co-conspirators attempted to find a buyer for J.S.'s policy and, in the process, commissioned an independent life expectancy evaluation for J.S. *See* Ex. 6. However, at least in part because the life expectancy evaluation did not show the decline that Mr. Quatrella and his co-conspirators expected, they were unable to find a buyer for J.S.'s policy, and the policy lapsed for non-payment of premiums. *Id.* On March 6, 2014, the defendant directed a paralegal to call Lincoln for the purpose of having the policy reinstated, and instructed the paralegal via email not to "mention anything about the loan of the premium from my clients." Ex. 7. Twelve days later, Mr. Quatrella facilitated the completion of certain forms that were part of the reinstatement application, which falsely represented to Lincoln that, among other things, the insurance was needed for estate planning (as opposed to investment) purposes and the policy was not being paid for with a premium financing loan. *See* Ex. 8. The defendant and his co-conspirators were unsuccessful in having the policy reinstated.

In the third instance, Mr. Quatrella and his co-conspirators arranged for an 82-year-old insured, A.G., to apply for and obtain a $10 million life insurance policy from West Coast Life Insurance Company ("West Coast"), with an effective date of

April 12, 2010. A.G. was not a client of the defendant's law firm, and the defendant did not help to complete A.G.'s application. However, Mr. Quatrella knew and intended that A.G.'s application contained material misrepresentations as to the policy's purpose, the means by which the premiums would be paid, and the intent to sell the policy after two years to downstream investors. *See* Ex. 9. Mr. Quatrella yet again recruited the initial pool of investors to pay the policy premiums from among his law firm's clients, and he transmitted premium payments to West Coast from his IOLTA. On October 11, 2012, in searching for a buyer for the policy, the defendant and a co-conspirator exchanged emails in which they discussed the fact that West Coast had "flagged the [policy] as probable STOLI" and strategized about how to address various "red flags," including the fact that the policy premiums were paid from Mr. Quatrella's IOLTA and whether the premium payments were financed by investors. Ex. 10.[2] The defendant and his co-conspirators ultimately succeeded in finding a buyer for the A.G. policy—at roughly a 10% loss against the premiums paid by the initial investors through the date of sale. The policy remains in effect.[3]

For their role in causing the issuance of these policies, the defendant and his co-conspirators shared in substantial commissions from Lincoln and West Coast. Mr. Quatrella's share of the commissions, and thus his personal gain from the criminal conduct, was $272,000. Some or all of the investors (who, as noted, were clients of Mr.

---

[2] One of the emails in this thread suggests Mr. Quatrella's involvement in still another illegal STOLI policy: "We did not encounter this issue on [insured's name] because all prior premiums were paid directly from his account." Ex. 10.

[3] West Coast has been notified of the Government's investigation and the proceedings in this case.

Quatrella's law practice) were unaware that Mr. Quatrella was making money on these policies whether or not the policies ultimately were able to be resold.

Because the two Lincoln policies lapsed and the West Coast policy remains in effect, no death benefits have been paid on any of these policies. In fact, the life insurance providers received more money in premiums than they paid out in commissions and other expenses. As a result, the insurers did not suffer any actual loss. There is, however, substantial intended loss of just under $15 million. *See* PSR ¶ 11.

## II.   Sentencing Guidelines

The Government agrees with the Sentencing Guidelines calculation in the PSR. The defendant's base offense level under U.S.S.G. § 2B1.1(a)(2) is 6. Twenty levels are added under U.S.S.G. § 2B1.1(b)(1)(K) because the intended loss exceeded $9.5 million.[4] Two levels are added under U.S.S.G. § 2B1.1(b)(10)(C) because the offense involved the defendant's use of sophisticated means, including setting up a trust that technically owned D.S.'s policy, using his IOLTA to disguise the fact that third-party investors were financing the premium payments, contracting for independent life expectancy evaluations on the insureds, and other means of insurance arbitrage. Two levels are added under U.S.S.G. § 3B1.3 based on the defendant's abuse of a position of trust (*i.e.*, Mr. Quatrella's attorney/client

---

[4] The defendant says that "the Government and defendant represented to the court at the time of the guilty plea that there is no calculable or actual loss." Def. Sen. Mem. at 22. That is not correct. The Government's position is that there is no actual loss, but the intended loss absolutely *is* calculable. *See* PSR ¶ 11.

7

relationship with D.S. and the investors) and/or his use of his special skill as an attorney. Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, resulting in a total offense level of 27. Because the defendant falls within Criminal History Category I, his Guidelines range is 70 to 87 months of imprisonment. However, because the statutory maximum for the offense of conviction is 60 months of imprisonment, that is the defendant's effective Guidelines range. *See* U.S.S.G. § 5G1.1(a).

### III.   Discussion

Consideration of the Sentencing Guidelines and the statutory factors in 18 U.S.C. § 3553(a)(1)-(2) demonstrates that Mr. Quatrella's crime warrants a substantial period of imprisonment. The most relevant factors are addressed here. The Government acknowledges that the defendant's age (61) and dedication to his family and friends (as reflected in the many glowing personal letters Mr. Quatrella submitted to the Court) are factors that the Court should weigh in the defendant's favor. Likewise, it is significant that the victim insurers did not suffer any actual losses in this case. As such, despite the duration of Mr. Quatrella's scheme, his abuse of his position as an attorney, and his personal gain from the crime, the Government believes a sentence of three years is sufficient here.

### A.   Seriousness of the Offense

By almost any measure, Mr. Quatrella's offense was serious. This was not a "one-off" crime or momentary lapse of judgment. Mr. Quatrella was an active participant in the scheme for more than seven years. In that time, he exposed

insurers to potential losses of approximately $15 million. He did so by flagrantly misusing his position as an attorney, including by signing a fraudulent application, writing fraudulent letters on his law firm's stationary, and using his IOLTA to conceal the fact that investors were paying the policy premiums. And for abusing his professional skills and responsibilities, Mr. Quatrella netted $272,000—certainly, a handsome sum.

It is true that the victim insurers in this case did not suffer any actual losses as a result of the defendant's crime. But at least as to the D.S. and J.S. policies, that is only because the insureds' life expectancies did not decline at the rate Mr. Quatrella and his co-conspirators expected and the secondary market for reselling life insurance policies dried up. It is difficult to see why either of those developments should result in a more lenient sentence for the defendant.

An egregious aspect of Mr. Quatrella's crime that is not adequately taken into account by the Sentencing Guidelines is its impact on the investors he recruited from among his law firm's clients.[5] Mr. Quatrella knowingly exposed these investors to a risk of loss, and indeed many of the investors remain mired in civil litigation stemming from their unwitting involvement in fraudulent policies. Many investors

---

[5] To be clear, the Government is not advocating that the Court should treat these investors as victims for purposes of the Crime Victims' Rights Act, 18 U.S.C. § 3771. The investors lost money because the secondary market for life insurance policies disappeared, *see* Ex. 4, not because the policies were fraudulent. That is, they were harmed because the policies were bad investments, not because the policies were criminal. *See* 18 U.S.C. § 3771(e)(2)(A) (defining "crime victim" to mean "a person directly and proximately harmed as a result of the commission of a Federal offense"). Nevertheless, the Government has been notifying the investors (through counsel) of the proceedings in this case, in case they wish to be heard in connection with sentencing.

were longtime clients of the defendant's and, in some instances, Mr. Quatrella also had close personal friendships with them. They trusted him implicitly. The Government is not aware of any credible evidence that the investors were aware of the misrepresentations contained in the policy applications or otherwise were part of the conspiracy.[6] In fact, Mr. Quatrella's crime came to light because the investors eventually discovered the misrepresentations and self-reported to Lincoln. All along, Mr. Quatrella presented the relevant policies to his clients as safe, legal investment opportunities. At his recommendation, the investors paid premiums of approximately $2,462,100 on the D.S. policy, $870,400 on the J.S. policy, and $1,112,994 on the A.G. policy. On the D.S. policy, the investors have recouped, through litigation, about thirty cents on the dollar from Mr. Quatrella's former malpractice insurance provider. There is ongoing litigation involving the J.S. policy, but to date the investors have received no money back. And as noted above, the A.G. policy ultimately was resold at a loss of approximately 10%. Hence, the investors have incurred losses of approximately $2.7 million.

It is troubling that an attorney would knowingly involve his clients in unlawful insurance policies, thereby exposing them to both financial and legal risk. But it is especially galling here that Mr. Quatrella stood to profit from these policies (through commissions) even if the investors did not. That is an obvious conflict of interest that

---

[6] Certain investors did receive, at some point, copies of the policies and applications. It is the Government's understanding that these investors relied on Mr. Quatrella's descriptions and did not inspect the documents themselves. The context here is important: as noted, many of the investors were longtime clients of Mr. Quatrella's real estate law practice, and they were accustomed to signing lengthy forms he provided to them without careful scrutiny, because they trusted that he had carefully reviewed the documents.

was not adequately disclosed to the investors, some of whom did not learn until early 2016 that the defendant earned commissions on these policies at all. *See* Conn. Rules of Prof'l Conduct R. 1.8 (2017) (prohibiting attorneys from entering into business transactions with clients). The Government is disturbed to see that the defendant has shown no remorse for this aspect of his crime, either in his sentencing memorandum, where the investors are described only as "highly successful, very astute individuals who had every opportunity to consult other counsel to determine whether they should fund the premium payments," Def. Sen. Mem. at 33, or in the defendant's own letter to the Court, which makes no mention whatsoever of the investors, *see id.*, Ex. A. These investors trusted the defendant—who had represented and counseled them for years—and he exploited his position as their attorney and friend.

B.     **Intended Loss as Compared to Gain**

Working in a number of pages, the defendant argues that the intended loss in this case (approximately $15 million) overstates the seriousness of the offense. *See* Def. Sen. Mem. at 24-28. The Government suggests that intended loss is a reasonable measure here, because the entire point of the defendant's scheme was to expose the victim insurers to considerable financial risk. Even so, the Government agrees that using intended loss in this case produces a Guidelines range that is somewhat higher than necessary, especially since there is *no* actual loss. An alternate proxy for culpability here could be the defendant's gain resulting from the offense ($272,000). Substituting gain for intended loss in the Guidelines calculation would produce an advisory range of 30 to 37 months of imprisonment. A sentence at the upper end of

that range (*i.e.*, three years) would reflect the defendant's multiyear involvement in the scheme and signal to the public (and other would-be offenders) that such egregious misconduct by a lawyer and officer of the court deserves strong condemnation.

### C. Personal History and Characteristics

The personal letters the defendant has submitted to the Court show his dedication to his family and friends, and the Court rightly should consider those relationships in assessing the defendant. But it is difficult to reconcile the descriptions in those letters of the defendant's "ethical sensitivity" and "integrity," *see* Def. Sen. Mem. at 11-12, with his dishonest conduct in this case. The defendant was involved for years in a multimillion dollar fraud aimed at fleecing insurers. He personally wrote and signed fraudulent documents. *See* Ex. 2.[7] He conspired to conceal his illegal conduct from his victims. *See* Exs. 7, 10. And he placed his own interests ahead of those of his clients who invested in the policies.

Nor is this the only instance in which the defendant committed fraud for his own financial gain. In 1997, Mr. Quatrella and a partner started a law firm together in Fairfield. The two partners worked closely together for many years and became friends. Yet in early 2012, without consulting his partner, Mr. Quatrella applied for

---

[7] The defendant attempts to distinguish his conduct from that of the defendants in *Binday*. *See* Def. Sen. Mem. at 31. Certainly, this is a smaller-scale fraud. Likewise, the defendant did not falsify financial or medical records for the insureds here. But the "rampant mendacity," false documents, and obstruction of efforts by the victims to ascertain the truth that characterized the conduct in *Binday*, *see* 804 F.3d at 598-599, were present here, too, *see* Exs. 2, 6, 7, 10. And unlike the broker defendants in *Binday*, Mr. Quatrella was a lawyer with the training and experience to know better.

and received a $100,000 line of credit in the firm's name from a local bank. Mr. Quatrella falsely signed the application as the sole member of the firm. He never told his partner about this substantial liability. In January 2015, Mr. Quatrella left the firm. His former partner did not learn of the line of credit until November 2015, when a bank representative called to inquire about the firm's failure to make its required payments. At the time, the outstanding balance on the line of credit was approximately $90,000. After being confronted by his former partner, the defendant paid off the balance. But Mr. Quatrella's willingness to defraud the bank and expose his partner of fifteen years to serious pecuniary risk without his partner's knowledge—all for Mr. Quatrella's own profit and at the same time he was engaged in the charged conspiracy—says as much about his character and greed as anything else.

### D.     Other Possible Bases for Departures

The defendant enumerates several other possible bases for downward departures under the Sentencing Guidelines, including the defendant's family circumstances and physical health, *see* Def. Sen. Mem. at 18-20, and his employment-related contributions and other good works, *see id.* at 3-18. The law does not support these departures here.

The Guidelines make clear that "family ties and responsibilities are not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.6. It is only where there are truly extraordinary family circumstances that a departure may be warranted. *See United States v. Carrasco*, 313 F.3d 750, 757 (2d

13

Cir. 2002); *United States v. Walker*, 191 F.3d 326, 338 (2d Cir. 1999). Hence, the Second Circuit has affirmed downward departures for a defendant who worked two jobs to support his wife, two minor children, grandmother, and a disabled father who depended on the defendant to get in and out of a wheelchair, *see United States v. Alba*, 933 F.3d 1117, 1122 (2d Cir. 1991); for a defendant who was solely responsible for the upbringing of four young children, including an infant, *see United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992); and for a defendant who was primarily responsible for supporting a wife and two young children (ages 8 and 9) where the defendant's wife spoke little English and had a limited earning capacity, *see United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997). In contrast, the Second Circuit has held that a district court abused its discretion in departing downward where the defendant provided some financial support for, but did not live with, his children and the defendant's ex-wife earned approximately $40,000 per year. *See United States v. Faria*, 161 F.3d 761, 763 (2d Cir. 1991) (per curiam); *see also Carrasco*, 313 F.3d at 756-57 ("Even if he is providing some support for his three children, being the father of three children is in no sense an exceptional circumstance."). That is essentially the situation here. Mr. Quatrella provides some support for, but does not live with, his children, who are in college in Pennsylvania. His wife works. No one depends on him for day-to-day care. To describe these commonplace circumstances as "extraordinary" deprives the term of its meaning.

Likewise, there is no basis here for a downward departure based on the defendant's physical health. The Guidelines provide that a defendant's physical

14

condition may be relevant in determining whether a departure is warranted, if the condition is present to an unusual degree and distinguishes the case from the typical case covered by the Guidelines. U.S.S.G. § 5H1.4. Thus, an extraordinary physical impairment may justify a downward departure. *Id.*; *see also United States v. Altman*, 48 F.3d 96, 104 (2d Cir. 1995) ("Section 5H1.4 of the Sentencing Guidelines restricts departures based on physical condition to defendants with an extraordinary physical impairment. . . ." (internal quotation marks omitted)). But there is no basis to depart if a defendant's health problems merely require monitoring, *see Altman*, 48 F.3d at 104, or to impose a non-incarcerative sentence if the defendant's condition can be adequately treated by the Bureau of Prisons, *see United States v. Cutler*, 520 F.3d 136, 172 (2d Cir. 2008). Here, Mr. Quatrella worked at his job until the week prior to his guilty plea. *See* Def. Sen. Mem. at 2. He has prostate cancer that is in remission. *See id.* at 19. He also has pancreatic lesions that have a 30% chance of *becoming* malignant and thus require surveillance. *See id.* at 20. In other words, he is not presently ill, and he has a strong likelihood of remaining that way. To the extent that regular monitoring is necessary, there is no basis for finding that the Bureau of Prisons is unequipped to provide that care.

Nor should the Court depart downward based on the defendant's employment-related contributions and other good works, which the Sentencing Guidelines state are "not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.11. The personal letters the defendant has submitted for the Court's consideration show that he has treated some former colleagues and clients, and

others in his circle of friends and acquaintances, with respect and kindness over the years. So, too, has the defendant done good deeds in his lifetime. But these factors are not present here to an "exceptional degree." *See United States v. Canova*, 412 F.3d 331, 358 (2d Cir. 2005). The defendant does not have a long history of volunteerism or charitable activity. And his treatment of some of his colleagues, clients, and friends is counterbalanced by his willingness to expose others to considerable risk for his own gain—namely, the clients he recruited to be investors in illegal insurance policies, and the former law partner whom Mr. Quatrella saddled with a $100,000 line of credit. The irony is that Mr. Quatrella's former partner and many of the investors now say that, had he involved others and not them in his frauds, they now would be the ones writing letters of support for him. That is, other than the facts of this case, there is no difference between the longtime friends the defendant was willing to place in jeopardy and those now beseeching the Court for leniency on his behalf.

### E. Collateral Consequences

The Government strongly opposes Mr. Quatrella's argument that he should be spared prison time due to the collateral consequences of his conviction. *See* Def. Sen. Mem. at 30-32. The effects of his conviction are entirely of his own device. "[T]he social stigma of being a convicted felon" is a "normal incident" of committing a felony offense. *United States v. Repking*, 467 F.3d 1091, 1096 (7th Cir. 2006); *see also United States v. Bistline*, 665 F.3d 758, 765 (6th Cir. 2012). To treat Mr. Quatrella's loss of stature or prospective inability to practice his chosen profession as grounds for

leniency is to risk treating white collar defendants less harshly than other criminals, who often do not have these things to lose.

All that said, the Government is not suggesting that the Court need impose a Guidelines sentence here in order to satisfy the goals of sentencing. While the Government believes that a Guidelines sentence is not unreasonable here, the aims of sentencing also may be fulfilled with a lesser, but still significant, term of imprisonment. The Government suggests that those aims could be met with a sentence of three years, which would reflect the defendant's substantial unlawful gain from the offense and his extreme abuse of his position as an attorney, while still representing a reduction of two years from the effective Guidelines range.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

*/s/ Avi Perry*

AVI M. PERRY
ASSISTANT UNITED STATES ATTORNEY
United States Attorney's Office
157 Church Street, 25th Floor
New Haven, CT 06510
avi.m.perry@usdoj.gov
203-821-3700
Federal Bar No. phv07156

17

## **CERTIFICATE OF SERVICE**

    I hereby certify that on April 27, 2017, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Avi R.

AVI M. PERRY
ASSISTANT UNITED STATES ATTORNEY