UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:17CR3(AWT) |
| | : | |
| vs. | : | |
| | : | |
| | : | |
| DAVID QUATRELLA | : | May 11, 2017 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE AND/OR TO BE HEARD REGARDING ORDER OF RESTITUTION**

Introduction

    This Memorandum is submitted in support of the Motion To Intervene And/Or To Be Heard Regarding Order of Restitution ("the Motion"). The Motion is submitted by the investors referenced in the Information (Paras. 17, 25, 26, 30 and elsewhere). The investors and the amount of their losses are identified in correspondence sent to Probation Officer January Welks on March 17, 2017. Doc. 22, Presentence Investigation Report (Supplement), Attachment #1.[1] For the reasons stated in this Memorandum, the investors are "victims" within the meaning of 18 U.S.C. § 3663A and an order of restitution is mandatory.

Factual Background

    The investors have been "directly and proximately harmed" by the defendant's commission of the offense of conviction and by the defendant's criminal conduct in the course of the scheme described in the Information. When "the D.S. Policy" lapsed in January 2016 (Information ¶ 27), the investors in that policy lost approximately 2.5

---

[1] As detailed in the correspondence to Ms. Welks, the undersigned counsel does not represent three of the investors in the J.S. Policy.

million dollars.  When "the J.S. Policy" lapsed in February 2014 (Information ¶ 31), the investors in that policy lost approximately $880,000.[2]

As stated in the Information, it was essential to the defendant's scheme that he have a pool of investors who would lend money to fund the insurance policy premiums until such time as the policies could be sold.  To accomplish this, the defendant, an attorney, recruited investors from among his own clients.  Information ¶¶ 25 and 30.  The defendant never disclosed to his clients that the investments they were making were tainted by the fraudulent statements contained in the policy applications.  Nor did the defendant disclose to his clients the fact that he was to receive $174,000 (Information ¶ 22) as his share of the commission paid for the issuance of the D.S. Policy and $98,000 (Information ¶ 28) as his share of the commission paid for the issuance of the J.S. Policy.

The investors did not sign any of the insurance applications and had nothing to do with the fraudulent statements made in those applications.  Had the investors known that the insurance policies they were investing in were issued based upon materially false statements, they would never have made their investments.  Because their attorney never explained it to them, the investors had no understanding at all of the

---

[2] The investors in the D.S. Policy recently settled a civil claim against the defendant and were paid a sum of money by the defendant's professional liability carrier.  The financial terms of the settlement are confidential, but we can state that the investors in the D.S. Policy were not made whole by the settlement and are still owed a very large amount of money.  The investors in the J.S. Policy have also asserted a civil claim against the defendant.  A settlement has recently been agreed to in that case, but has not been finalized.  The financial terms of this settlement are also confidential, but we can state that the investors in the J.S. policy will not be made whole by the settlement and will still be owed a very large amount of money.  The confidentiality provisions of the settlement agreements in both cases allow for disclosure of the financial terms upon appropriate order from a Court.  In addition, the undersigned counsel is negotiating with Lincoln Insurance in an effort to recover a portion of the premiums paid on the D.S. Policy.  In all likelihood, those negotiations will result in the recovery of only a nominal sum.  The investors are not seeking any double recovery and will account for all compensatory sums received from other sources.  "[A] private settlement between a criminal wrongdoer and his victim releasing the wrongdoer from further liability does not preclude a district court from imposing a restitution order for the same underlying wrong." *United States v. Bearden*, 274 F.3d 1031, 1041 (6th Cir.2001).

legal problems and investment risks associated with Stranger Originated Life Insurance ("STOLI"). It was not until the investors were referred to the undersigned counsel in January 2016 that the STOLI concept was first explained to them and they first learned of the defendant's fraudulent scheme. The investors responded to this newly acquired knowledge by authorizing the undersigned counsel to report this matter to the U.S. Attorneys Office and to make a full disclosure to Lincoln Insurance. At various times, since January 2016, the undersigned counsel and the investors, as well as D.S. and his attorney, have met with the government attorneys and the FBI case agent to provide information relating to this matter. The undersigned counsel and counsel for D.S. also reported the defendant's conduct to the Connecticut Office of the Chief Disciplinary Counsel.

      The J.S. policy lapsed in February 2014 for nonpayment of premium. The circumstances of the lapse are not entirely clear, but the lapse appears to have been the result of a miscommunication involving the premium billing notices that were issued by the insurer. The J.S. policy was owned by an insurance trust. One of the trustees was an attorney in Greenwich and the billing notices from the insurer were sent to him and he in turn would forward the notices to the defendant. Because the defendant and the investors were strangers to the J.S. policy, they did not receive billing notices directly. The final billing notices and the lapse notice on the J.S. policy were either not received by the Greenwich attorney or not forwarded by his office to the defendant. This caused the J.S. policy to lapse for nonpayment of premium. An application was made to reinstate the J.S. policy, but the insurer declined to reinstate it.

The D.S. policy lapsed in January 2016 when the investors learned of the fraudulent policy application and made a conscious decision not to pay the premium that was then due.  Instead, the investors instructed the undersigned counsel to make a full disclosure to the insurer and then seek reinstatement of the policy.  After the disclosure was made to the insurer, an application was made for reinstatement but the insurer has refused to reinstate the policy.  Lincoln Insurance is known to have a strong anti-STOLI policy and so would never knowingly reinstate such a policy.

In addition to instructing the undersigned counsel to make a full disclosure to the insurer which issued the D.S. Policy, the investors also instructed the undersigned counsel to report this matter to the U.S. Attorney's Office.  The undersigned counsel, together with the attorney for D.S., met with government attorneys and furnished the information which led to the instant prosecution.

## Argument

Under Section 3663A, the term "victim" means "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  The government does not advocate the position that the investors are "victims."  In the government's view, the investors were harmed because "the polices were bad investments, not because the policies were criminal."  Government Sentencing Memorandum at ftn. 5.  The government's analysis is overly simplistic, however, and does not take into

consideration the many ways in which the defendant's scheming is connected to the investors' loss.

To begin with, the money put up by the investors was an essential feature of the scheme and the means by which the defendant profited.  The commissions from which the defendant got his cut were paid by the insurer after the first year's premium was paid by the investors.  In order to keep the money flowing from the investors, it was a necessary part of the scheme that the investors be kept in the dark, both about the fraud in the policy applications and about the defendant's own financial interest in the two transactions.[3]  Had the defendant disclosed the underlying fraud to the investors and disclosed the full extent of his own financial interest, the investors would never have put their money up and thereby would have avoided the loss altogether.  Thus, the non-disclosure to the investors was an essential feature of the defendant's scheme and lead directly to the investors' losses.

The defendant's criminal conduct also resulted in the creation of investments which, unbeknownst to the investors, were inherently risky <u>because of the fraud involved</u>.  In the case of the D.S. policy, when the investors learned of the fraud in January 2016 they were faced with the choice of either continuing to make payments on the policy, thereby becoming part of the fraud, or stopping the payments and allowing the policy to lapse.  They chose to let the policy lapse and authorized their counsel to disclose what they knew to both the U.S. Attorney's Office and to Lincoln Insurance.  Thus, the lapse of the D.S. Policy was a direct result of the fraud perpetrated by the

---

[3] Nondisclosure of the fraud was also necessary for the defendant to avoid the risk that one or more of the investors might reveal his conduct, as ultimately happened here.

defendant. The defendant's fraud is also the likely reason that the insurer has refused to reinstate the policy.

The defendant's fraud was also the direct and proximate cause of the loss of the J.S. Policy. The billing communication problem which resulted in the missed premium payment was a consequence of the STOLI character of the policy. Because the defendant was a stranger to the J.S. Policy, he could not receive billing notices directly, because that would be a red flag to the insurer. Instead, the defendant had to rely on the bills and notices being forwarded from the Greenwich attorney. That machination eventually broke down causing the missed premium payment and the policy lapse. Even if the J.S. Policy had not lapsed in 2014 as a result of the billing notice snafu, in 2016 the J.S. Policy would have met the same fate that the D.S. Policy met. The investors in the J.S. Policy would learn about the fraud in 2016 and would be forced to make the same choice that the investors in the D.S. Policy made.[4] Because of the defendant's fraud, the value to the investors of the J.S. Policy was destined to be destroyed just as the value of the D.S. Policy was destroyed.

How the investors came to put their money into the J.S. and D.S Policies and how those investments met their demise amply demonstrates why, in this particular case, the fraud perpetrated by the defendant "directly and proximately caused harm to the investors." A further understanding of how the promotor of a STOLI scheme puts unwitting investors at risk of loss can be gained by looking at the broader picture of the STOLI world. Because of the underlying fraud on the insurers, risk of loss to investors exists on various levels. On a primary level, there is a heightened risk of loss if the

---

[4] Many of the investors in the J.S. Policy were also investors in the D.S. Policy.

insurer learns of the STOLI violation.[5]  The insurance industry reacted strongly against the rise of STOLI investments and there has been a lot of civil litigation between insurers and STOLI investors.  In Connecticut, what little law there is on the subject, holds that an insurer, when it discovers the existence of a STOLI policy, may rescind the policy without repayment of any of the premiums paid to the insurer.  *PHL Variable Insurance v. Charter Oak Trust*, 2015WL6964586; 2012WL2044416.

There is also inherent risk for an unwitting STOLI investor because the secondary market, where life insurance policies are sold, has also become sensitized and so avoids investment in suspected STOLI policies.  The government's discussion of the A.G. Policy, Government Sentencing Memorandum at pp. 5-6 and Ex 10 (Doc. 24-10), states that, Western Insurance, the insurer which issued the A.G. Policy, had flagged it as a potential STOLI policy.  The government misreads the e-mail chain which is Exhibit 10 (Doc. 24-10).  The e-mail exchange between the defendant and the unidentified correspondent is actually an e-mail exchange between the defendant and the broker who is trying to marker the A.G. Policy in the secondary market.  It was not the insurer, Western Insurance, who red flagged the A.G. Policy, rather it was the prospective institutional purchaser of that policy.  The prospective purchaser had a "compliance department" and a "pricing department" which were conducting due diligence.  The compliance department of the prospective purchaser had identified the A.G. Policy as a probable STOLI policy and suspended the purchase transaction.  Because a purchaser in the life insurance secondary market would be aware that the

---

[5] The defendant himself was acutely aware of this risk.  When he was trying to determine the status of the J.S. Policy during the critical lapse period, he instructed a paralegal at the office of the Greenwich attorney to contact Lincoln Insurance but, "Please do not mention anything about the loan of the premium from my clients…"

insurer would have a potential defense to the payment of death benefits under a STOLI policy, buyers in the secondary market avoid purchasing policies with STOLI markings. In the case of the A.G. policy, the prospective purchaser became suspicious when it learned that policy premiums had been paid through the defendant's IOLTA account. As the broker explained, "It is important to understand that we are going to face this issue regardless of buyer.  Every provider knows to look out for potential STOLI and the fact that premiums were paid from your account is a red flag."  Doc. 24-10 at p.1. Because of the level of sophistication among buyers in the secondary life insurance market, the value of a STOLI policy to unwitting investors is questionable from inception.  The investors' loss in this case was a direct result of the inherent risk created by the defendant's fraudulent conduct.

      The status of the investors as "victims" is supported by the recently decided Fifth Circuit decision in *United States v. Bazemore*, 839 F3d 379 (5th Cir. 2016).  *Bazemore* is another STOLI case in which a restitution order was entered in favor of a lender who paid the premiums on several life policies which later lapsed.  In that case, a restitution order entered in favor of insurers who suffered losses, but also in favor of the lender who advanced money to pay the insurance premiums.  The loans were not repaid and when the policies lapsed there was no collateral securing the loans.  The investors here are in precisely the same position as the lender in *Bazemore*.  Attached as Exhibit A to this Memorandum is a copy of the government's sentencing memorandum ("Memorandum on Restitution and Modification to Second Addendum") in the *Bazemore* case which explains in more detail how and why the lender was a victim in that STOLI scheme.

In the Second Circuit, "victim" status has also been extended to persons who may not have been the intended target of the fraud but who are none the less directly harmed by it. *United States v. Simmons*, 544 Fed. App. 21 (2013) ("Summary Order"). *Simmons* was a bank and wire fraud case involving fraudulent real estate mortgage applications. When the loans went into default, a real estate management company which managed the properties incurred expenses in maintaining the properties. Although the financial institution which made the loans was the target of the fraud, a restitution order in favor of the property management company was upheld. The management company was "directly harmed by the defendant's criminal conduct in the course of the scheme. 18 U.S.C. § 3663A(a)(2). It is irrelevant that the charges in the information are focused on fraudulent misrepresentations to financial institutions because "[a] sentencing court is authorized to provide restitution to any victim of the offense, even those not named in the criminal indictment." 544 Fed. App. at 22-23.

The defendant describes the investors as "highly successful, very astute individuals who had every opportunity to consult other counsel to determine whether they should fund the premium payments in either one of these policies." Defendants Sentencing Memorandum at p. 32. What the defendant should have said is, "I am sorry that I took advantage of my clients of many years, who obviously trusted me and didn't think for a second that they needed to consult with other counsel. I also apologize to the investors and to the Court for my blatant violation of Rule 1.8 of the Rules of Professional Conduct which required me to avoid business transactions with clients unless I advise them in writing that they should consider seeking advice from other counsel. Finally, I apologize to the investors for not disclosing to them the fact that the

policies that they were investing in were tainted by fraud and the fact that I stood to make $272,000 as a result of their investment.  I realize now that had I acted in a more ethical fashion and had I fully disclosed to my clients the true nature of the transaction they were investing in and my substantial financial interest in it, my clients would not have made the investments that they did and they would not have suffered the financial losses that they have."

For all the reasons stated, we request that the sentence in this matter include an order of restitution in favor of the investors.

                              THE INVESTORS

                              By  /s/ Dan E. LaBelle
                                  Dan E. LaBelle
                                  HALLORAN & SAGE LLP
                                  Fed. Bar #ct 01984
                                  315 Post Road West
                                  Westport, CT  06880
                                  Telephone: (203) 227-2855
                                  Facsimile:  (203) 227-6992
                                  labelle@halloran-sage.com

## **CERTIFICATION**

    I hereby certify that on May 11, 2017, a copy of the foregoing Memorandum was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

                                                     /s/ Dan E. LaBelle
                                                      Dan E. LaBelle

# EXHIBIT A