# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

FILED

2017 JUN -5  A 9: 10

US DISTRICT COURT
BRIDGEPORT CT

UNITED STATES OF AMERICA

v.

DAVID QUATRELLA
(AWT)

CRIMINAL NO.: 3:17CR0003

June 5, 2017

## MOTION FOR RESENTENCING/REDUCTION OF SENTENCE/RESTITUTION

**Agreed Request to Make a Special Appearance for the Filing of this Motion only. See: Certificate of Meet and Confer,  pp. 16-19.**

*Federal Rule Criminal Procedure 35 (a)* provides that a United States District Court Judge must reduce a sentence for "clear error" on its own motion or by motion of the defendant if filed within 14 days from the pronouncement of the sentence.  Sentencing was pronounced on May, 25, 2017. It is now 11 days after sentencing.  The Court retains jurisdiction to adjudicate this motion and  the denial of  a 35 (a) motion is an appealable order independent of the direct appeal.

This motion is both timely and meritorious

## INTRODUCTION

This Honorable Court was deprived of the rudimentary information to make an informed and correct determination of the sentence due to a breakdown in the adversarial system after the plea. The Defendant is not moving to set aside the plea, takes responsibility and is remorseful for his actions.

Without some expert testimony or at least proper briefing the court was not informed as to how insurance companies determine loss on "Stranger-originated Life Insurance policies" (STOLI). Under no circumstances was the broad brush suggestion by the Government or the argument by defense counsel an accurate way to determine loss according to any expert in the insurance field. And that would explain why there is a case on point that establishes "clear error" in the determination of loss, which is the bulk of the sentence. That case exactly on point is a STOLI case reversing the guideline calculation. This case was never cited by the defense, nor was the underlying theory

of insurance loss in STOLI policies provided to the Court. See: Section
A, pp.  4-6, supra.

The "victims" were thrust upon the Court at the last moment even
though the Government conceded that the investors were not victims.
Defense counsel did no investigation, cross-examination or motion to
continue.   In fact the Court was so sensitive to this issue that it asked
counsel for both parties  if he were contesting or in agreement with the
allegations of these witnesses.  Had defense counsel pursued the right
to confront  it would have been established that the "victims" knew or
should have known exactly what they were getting into when they
invested in these policies and rolled the dice more in what would be
described as willing participants, which is a status which disqualifies
one for restitution.  See: Section B, infra;  See: *18 USC 3663 (a) (1)* (but in no
case shall a participant in an offense under such sections be considered a victim of
such offense under this section).

The why questions are the most interesting and important to any
inquiry.   The answer I surmise is the perfect storm of a federal criminal
justice system that has lost its adversarial edge and true purpose due to

a 97% plea rate; a STOLI related offense that is not cookie cutter like a drug or immigration related charge with only a handful of District Court Judges having one on its docket; a case before the Court with no Indictment; a case before this Court with no motions; a plea agreement that although fair on its face had few closed ends or guidance to the Court; and no confrontation of witnesses.  As the Washington Post says as its mission statement, "Democracy Dies In Darkness."   The presentation of the evidence in this case left the Court somewhat in the dark. Vacating this sentence and resentencing  Mr. Quatrella with the proper adversarial safeguards and essential information provided to the Court and Probation Department must be granted.

A. <u>Intended Loss</u>

The Government's statement in its sentencing memorandum related to the Government's request for a 20 point enhancement for the amount of loss was, "I  agree with the calculation in the PSR." And in footnote 4, "There is a calculable loss based on intended loss."   (R. 24, p. 7).  The PSR analysis was a dry recitation that the intended loss was $14,982,714.27 (the amount of the face value of the policies). (PSR p. 9,

4

paragraph 20). The Defense input on the issue was: 1) The *Binday* decision in the Second Circuit stands for the position that intended loss is not tethered to fact." (R. 23, p. 22);   2) That there was no actual loss. (R.23, p. 24);   and 3) the intended loss substantially overstates the seriousness of the offense citing *Corsey*. (R. 24-25).

Neither the Government nor the Defendant cited *Bazemore*, i*nfra*. However, the case was cited by the attorney for the investors in its motion to intervene, and argued orally at the hearing on the intervention. He asserted that this case stood for the principle that the status of the investors as victims is supported by *Bazemore,infra*. (R. 26, p. 9).   *US v Bazemore*, 839 F. 3d. 379 (5th Cir. 2016).

However, *Bazemore,supra*  stands for the exact opposite of what was represented by counsel for the investors.   Counsel for the investors cited the second *Bazemore* decision, an appeal following the remand of the *Bazemore,supra*  case.   *Bazemore ,supra II* simply restated its holding in *Bazemore* I, which is wholly supportive of the defendant's position on the loss calculation. *Bazemore* I, *supra*  is the case that analyzes the principle of the loss calculation based on the facts of it and

the instant case.  US V. *Bazemore,*   608 Fed.Appx. 207, 209 (5th Cir. 2015).

Therefore two years before the intervention hearing there was a

factually identical case that held:

> The district court erred in using the face values of  the
> insurance policies to calculate the intended loss of  *Bazemore's*
> scheme. Under U.S.S.G.  2B1.1…

. 'Actual loss'  means the reasonably foreseeable pecuniary
harm that resulted from the offense.  'Intended loss' means
pecuniary harm that was  intended to result from the
offense.  The Government argues that the intended loss of
the scheme is the amount of the death benefits-81 million
dollars. Because that was the dollar amount placed at risk
by *Bazemore's* scheme.…

> We reject the Government's argument..

>  The risk to the insurance company is that the insured will
die more quickly than anticipated by the actuarial model
forcing the insurance company to pay death benefits before
receiving the expected amounts of premium…

>  Since the Government concedes there was no mis-
representation of the age or health of the insured
…accordingly we VACATE  *Bazemore's* sentence.

In the instant case neither the prosecutor nor defense attorney

alerted the court there was a case directly on point in favor of the

defendant in the most significant sentencing factor in the case.  And

counsel for the interveners' misrepresented the plain holding of

*Bazemore,supra*  in an effort to win their restitution claim.

6

Thus there is clear error of a prejudicial nature and like *Bazemore,supra* the sentence must be vacated.

B.  <u>Lack of Confrontation of the Victim Investors</u>

Based on information and belief, and the Affidavit of Mr. Quatrella, the Court stated in effect at the hearing re: the Motion to Intervene-Is there an agreement regarding the facts raised by the investor's in the STOLI policies?  Again based on information and belief, in response counsel for Mr. Quatrella was close to accepting the facts, leaving this Honorable Court with the impression the investors were virginal in their knowledge and experience with insurance policy investments and helpless victims of counsel's own client.  Such impression by the Court stems from a breakdown in the adversarial system that not only affects restitution but infected and prejudiced the entire sentencing process and created a profound false negative impression of Mr. Quatrella two days before sentencing.  The almost total dilution of the Defendant's Sixth Amendment Guarantee of the Right to Confront his accusers reaches to the highest peak of error in the law-it is "structural" in nature.

At a resentencing, the Defendant could establish at a minimum that almost to an investor, this group was: 1) seasoned in life insurance premium financing policy principles; 2) sophisticated investors; 3) interconnected by blood and money; 4) had been involved in past similar investments; 5) copied and well versed in the policies at issue; 6) false in their letters to the court; and 7) have settled and released all claims against Mr. Quatrella.   In short they were willing participants in the investment in stranger originated policies.  At a minimum, the concept of "willful blindness" would be a kind euphemism and disqualifier from any restitution pursuant to 18 USC 3663 A (1) (a) ("Participants are disqualified").

1. The Blood

a) The Julian Family Members

Anthony Julian, Michael Julian, Dan Julian, Raymond Julian (recently deceased), Paula Julian, Dominick Julian, Guido Picarazzi, Jr. and Mickey Picarazzi are closely related. Raymond Julian and Dominick Julian are the patriarchs.  Paula Julian is married to Dominick Julian. Michael Julian, Anthony Julian and Daniel Julian are brothers and sons

of Dominick Julian.   Guido Picarazzi, Jr. and Mickey Picarazzi are nephews of the patriarchs, Dominic and Raymond Julian.

(B) The McCarthy Family Members

Jim McCarthy is the father of Megan Murphy and Brenda McCarthy.  MB apartments and CT LLC are family owned and operated businesses.

Thus 11 of the 16 investors in the STOLI policies are close family members of the Julian or McCarty families and knowledge by one would likely be transmitted to all under the circumstances that follow and due to an admission by one investor in his letter to the Court.

2. The Investor's 14 year History with STOLI Policies

Patriarch, Ray Julian, (now deceased) invested in almost all of the stranger originated policies beginning in 2003.   Anthony Julian, the nephew of Ray Julian was involved in insurance policy financing since 2003.  In the summer and early fall, 2003 he performed an investigation lasting three to four months concerning the life settlement industry and premium financing in general.

Ray Rizio for almost the entire time relevant to the facts in this case was the law partner of Defendant David Quatrella. Rizio was interested, discussed these policies with Mr. Quatrella and in fact Rizio was an investor in an unrelated policy and made money on his investment. After David Quatrella terminated their law partnership on May 31, 2015 for reasons unrelated to this matter, Ray Rizio was upset and so bent on revenge that he searched David Quatrella's personal emails without permission. He searched for every email he thought could bolster the prosecution against Mr. Quatrella and turned them all over to the Government. He brought intense bias into these proceedings and in essence was a witness for the Government.

Dan Julian who invested in the Adams Company Pension received a finder's fee for participating in putting together a STOLI policy, in the instant case.

Most of the others were provided with copies of the STOLI policies in which they invested. Some members of the investor group were so alarmed when the insured, Donald Sherman, became a health freak that they suggested amongst themselves to tell him to falsify a physical exam

because a healthy physical exam would make the policy less valuable on the open market. This idea was not carried out but even if said in jest, it demonstrates the investors were well aware of the market forces in selling the policy known as DS.   Thus the investors had the motive, means and opportunity to clearly understand the nature of their investments and understand the changing tide in the insurance industries and that a misrepresentation of the insured's intent to sell the policies became increasingly important to continue reaping the rewards of investments in past insurance policy investments.

3. Wealth and Sophistication of the Investors'

Former law partner Ray Rizio is a multi millionaire dollars and enjoys significant passive income.

Raymond Julian at the time off his death had an estate worth many millions of dollars.   Paula Julian invested with Raymond  Julian and is a multi millionaire.

Dominick Julian, his brother often made investments with Ray Julian and his net worth would most likely approximate his brother's.

11

Prime mover of the investment in insurance policies since 2003 Anthony Julian is a wealthy man, at least a millionaire. Brothers Michael Julian and Daniel Julian are involved with brother Anthony in real estate development, mining and stone manufacturing and are all successful and wealthy.

The Picarrazzi brothers own a very successful construction business and are multi millionaires.

Investor Lee Pereira is the largest stair manufacturer in the State of Connecticut and perhaps the New England region.

Jim O'Brien is a highly successful residential mortgage broker employed by the national brokerage investment firm Mortgage Master, a division of Loan Depot. He is also a millionaire. He lives in what is arguably the nicest and largest home in Trumbull Connecticut which he purchased from Ray Rizio more than 10 years ago for $1,683,000.

Megan Murphy and Brenda McCarthy finances are less well known and will be supplemented by investigation if the sentence were to be vacated. It is known that Megan Murphy owns a home on the same street

12

as James O'Brien and her home has been valued at approximately $1,000,000.00.

4. The Proof Submitted by the Investors

A brief comparison to the letters submitted to this Court by the investors to the facts above demonstrates the level of deception in this matter and the lack of even a minimum attempt to employ the tools of the adversary system by trial counsel for Mr. Quatrella.

a) Anthony Julian

In Anthony Julian's letter to this Court dated May 23, 2017: "I was completely shocked to learn that the life insurance policy investments, that he had me and other long time clients of his invest in, were illegal." (Par. 1). "Greed was driving Mr. Quatrella. If I had *known **any** of the facts beforehand, I would not have invested and looked for another attorney. (Par 2).* This statement was made by a man who had been researching and investigating premium financing of the insurance policy investment since 2003. Mr. Anthony Julian concludes with a cry of poverty and fear of a devastating retirement on his horizon. (Par 3). Please contrast to the information about his finances above.

b) Jim O'Brien

Mr. O'Brien stated that the investment he lost is needed for his children to attend college. He further stated that the premiums would jeopardize the college education of his children.  However his children have GRADUATED from college.

He further stated that he had no knowledge that the investments were STOLI policies. By profession Mr. O'Brien is employed by a real estate mortgage investment firm. He lives in what is arguably the nicest and largest home in Trumbull Connecticut which he purchased from Ray Rizio more than 10 years ago for $1,683,000.

c) <u>Michael Julian</u>

He stated that when he was offered the chance to invest in the insurance policies that are the subject matter of the criminal activity, I never thought for *one instant* that this would be illegal or fraudulent. (Par. 2). I cannot and will not knowingly deal with dishonest people. (Par. 4). This was stated by  the brother and business partner of Anthony Julian, who was adept at insurance policy financing since 2003. He further stated that he invested his children's education in these policies.

(Par. 3).   Michael Julian is involved with his brother Anthony in real estate development, mining and stone manufacturing and is very successful and wealthy.    What is quite telling about Michael Julian's letter to this Court is that he speaks for all investors assuring he knows them intimately. *I think <u>everyone</u> would have declined.* (Par. 4). *If <u>we</u> are not victims, would someone explain to me who they are??* (Par. 5).   This supports Defendant's theory that knowledge by one is attributed to all and willful blindness is a kind way of characterizing the investor's knowledge of the intricacies of these policies.  These "victims" were serial investors in insurance policies and many had cashed in handsomely beginning in 2003.

Mr. Quatrella brought many of these facts to the attention of his counsel. (See: Attached Affidavit David Quatrella). However, counsel virtually stipulated to the letters and contentions of the investors without out making these facts known even when asked by the Court to effect whether anything was amiss.

   C.Due Process Violations

The letters that were damning to the Defendant was the basis for the Government's dramatic argument at sentencing that the Defendant was of bad character, which completely undermined the sole defense of his client, because the 40 persons sitting on the Defendant's side of the courtroom would be sitting with the 'victims" had they invested in the policies. The letters that were far less than truthful were filed two days before sentencing. That is a violation of the Fifth Amendment right to Notice and the Sixth Amendment guarantee of assistance of counsel.

## CONCLUSION

Mr. Quatrella's sentence was illegal and the numerous errors are each "clear error," and if combined are cumulative error. It is not the Court that made these errors as it was kept in the dark at each turn. This is truly a case that far surpasses any threshold in Rule 35 (a).

A new sentencing hearing is in the best interests of judicial efficiency and would avoid a time consuming and costly appeal. We have the rare opportunity of a legal crystal ball as provided by *Bazemore I, supra.*

Accordingly, the sentence pronounced on May 25, 2017 must be VACATED  and a new sentencing date and referral to the US Probation office must be ordered.

## CERTIFICATE OF MEET AND CONFER

I, Richard Hamar, hereby certify that I meet and conferred with lead prosecutor AUSA Avi M. Perry, Esq. by email and telephone on Sunday June 4, 2017 to request his position on whether may make a Special Appearance to file this motion. I provided the following reasons: 1)  I am out-of-state counsel who was retained by Mr. Quatrella on short notice after he used due diligence and began immediately consulting with other local attorneys following his sentencing on May 25, 2017; 2) That I was first contacted on Tuesday May 29, 2017 while in my office in California to look into post-sentencing representation; 3) I used due diligence, read the file on Pacer, spoke to my client numerous times, spent Thursday June 1, 2017 in the law library in San Diego, was retained and flew by red-eye to JFK and began working with Mr. Quatrella at 7:00 AM June 2, 2017.  I have worked with him a minimum

of 10 hours per day on a continuous basis; 4) I continued to read the local rules on a need to know basis; 5) I qualify for Pro Hac Vice Status and have been granted same numerous times in my career and have never been denied same in 40 years of federal practice; 6) That the Motion in my opinion is meritorious; 7) That Local Rule 83.1 requires two sponsors who have known me for six months; 8) this is a requirement I thought I could meet as I have worked in association with a member of this bar for the last 35 years on federal criminal matters and another for 25 years. However, one has recently left his office at age 76 and another has passed away; 9) The Motion has a 14 day filing deadline; 10) I have made numerous Special Appearances in District Courts nation-wide; 11) Filing one post trial sentencing motion is more akin to a Special Appearance than the extensive obligations to the Court if I were handling the matter from the initial stages; 12) Other issues like the normal delays in the filing of the Pro Hac Vice Application and obtaining an Order, thereafter obtaining an efiling number could render the motion untimely, greatly prejudicing the rights of Mr. Quatrella;  13) I used due diligence by also requesting Mr. Bowman, his counsel of record to file same. Mr. Bowman

was extremely gracious and professional and said he would seriously consider filing same even though it calls his performance into question; 14) I would prefer not to create a potential conflict for Mr. Bowman although his mere filing of this motion has little chance of creating a conflict, it is uncomfortable given the allegations herein; 15) I also explained the grounds to Mr. Perry; 16) Although he was in the office preparing his case-in-chief for a continuing trial he heard me out and asked appropriate questions about both my background and the grounds of this motion. I am presently working on a case with local Special Agent, Russell Day, who Mr. Perry works with on a constant basis so there was a reference for him; 17) I sent Mr. Perry a published article I wrote about protecting the Ninth Circuit to show him both my status in the federal community and my writing ability; 18) Upon careful consideration Mr. Perry stated he had no objection to making a Special appearance simply to file the motion and suggested I send a courtesy copy to the Court and discuss this matter with Judge Thompson's law clerk. He provided the email address of Vinay Limbachia as Vinay_Limbachia@ctd.uscourts.gov; 19) Under no circumstances does

Mr. Perry's agreement to permit me to file same as a Special Appearance waive any rights off the Government to contest this motion, which I fully expect will be contested; and 20) I know I am under a continuing duty to pursue my Pro Hac Vice application.

Hereby Certified as true pursuant to the laws of perjury in the State of Connecticut.

_____/ss/

Richard A. Hamar
June 4, 2017

Respectfully Submitted,

_____/SS/

Richard A. Hamar, Esq
CA Bar 47952
Author of this motion
Attorney for David Quatrella
Pending Pro Hac Vice Application
Seeking to make a Special Appearance
For the filing of this motion only
Retained Counsel for Defendant
David Quatrella
6/5/2017

# CERTIFICATE OF SERVICE

I hereby certify that on the 5 day of June, 2017, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following: Avi Perry; Andrew Bowman;  Daniel LaBelle; And I hereby certify that I will mail the document by U.S. mail to the following non-filing user: Richard A. Hamar, West Broadway, Suite 400, San Diego, CA 92101 (pending Pro Hac Vice status)

_____/SS/_____
Richard A. Hamar